**ARA LEISURE SERVICES, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Printing and Graphic Communications Union No. 17, Intervenor.**

**No. 85–1368.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 7, 1985.

Decided Jan. 28, 1986.

Norman Buchsbaum (Douglas E. Koteen, Craig F. Ballew, Law Offices of Norman R. Buchsbaum on brief) for petitioner.

L. Pat Wynns (Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Andrew F. Tranovich on brief), for appellee.

Before HALL, MURNAGHAN, and WILKINSON, Circuit Judges.

WILKINSON, Circuit Judge:

ARA Leisure Services, Inc. petitions for review of a decision by the National Labor Relations Board finding ARA guilty of unfair labor practices. *ARA Leisure Services, Inc.*, 272 N.L.R.B. No. 199 (1984). Specifically, the Board adopted the decision of an Administrative Law Judge ("ALJ") that ARA violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act when it discharged certain novelty vendors from their jobs at a sports arena in Indianapolis, Indiana. Because we find no error in the Board's action, we deny the petition for review and grant enforcement of the Board's order.

I

ARA sells food, beverage and novelty items in Market Square Arena in Indianapolis under a concession lease agreement with Market Square Associates.[1] The nov-

---

1. Because ARA transacts business within this circuit, this court has jurisdiction to review the Board's decision under 29 U.S.C. § 160(f).

elty vendors are classified either as "table-heads" or "helpers." In late 1982, twelve individuals served as tableheads. As the title implies, each was responsible for a tabletop operation selling novelty items in the concourse of the arena. Each table-head worked closely with one or more help-ers—hired by the tablehead—who assisted at the table or hawked items inside the arena itself. A total of twenty-six helpers worked at Market Square under this ar-rangement.

The instant dispute arose from the ef-forts of intervenor Printing and Graphic Communications Union No. 17 to organize ARA personnel at the arena. In December 1981, early in its organizational campaign, the union filed a representation petition for a unit of all ARA novelty and souvenir vendors at Market Square. The Board's Regional Director found the suggested unit inappropriate because these employees did not possess interests sufficiently distinct to warrant separate representation.

The union again filed a representation petition in November 1982, but broadened the suggested unit to include "[a]ll food, beverage, novelty and souvenir sales em-ployees, all commissary employees, [and] all money room cashiers." ARA contested the propriety of this unit on two grounds. First, it argued that the tableheads were independent contractors, and therefore nei-ther they nor their helpers were ARA em-ployees. Alternatively, ARA characterized the tableheads as supervisors and there-fore not within the coverage of the Act. See 29 U.S.C. §§ 152(3), 164(a). On Decem-ber 22, 1982, the Regional Director directed an election but excluded the tableheads as supervisors. The election was set for Jan-uary 18, 1983.

In light of the finding that tableheads were supervisors, ARA sent a letter dated January 3, 1983 to seven tableheads who were members of the union's organizing committee. The letter informed these ta-bleheads that they were discharged "for being disloyal to the Company concerning the union." The next day ARA wrote to the eighteen helpers of these tableheads that "your supervisor was discharged for disloyalty to the Company concerning the union" and "your services are no longer needed." On January 12, the Board post-poned the election indefinitely.

In the subsequent unfair labor practice proceedings, the ALJ rejected ARA's asser-tion that the tableheads were independent contractors. He did, however, find their discharge as supervisors permissible under the doctrine of *Parker-Robb Chevrolet, Inc.*, 262 N.L.R.B. 402 (1982), *enforced sub nom., Automobile Salesmen's Union Lo-cal 1095 v. NLRB*, 711 F.2d 383 (D.C.Cir. 1983). The ALJ rejected—both on these facts and as a matter of law—the theory that the firing of supervisors constituted an unfair labor practice because it was intended to thwart the union activity of rank-and-file employees.

With respect to the discharge of helpers, however, the ALJ concluded that ARA's action was so inherently destructive of sec-tion 7 rights as to give rise to an inference of unlawful intent without need for specific proof. *See NLRB v. Great Dane Trailers*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967); *NLRB v. Erie Resis-tor Corp.*, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). The ALJ also found sufficient specific evidence to warrant the inference of anti-union animus and conclud-ed that the discharge of helpers violated sections 8(a)(1) and 8(a)(3).[2] The Board adopted the relevant portions of the ALJ's decision, though it relied only on specific evidence of intent and found it unnecessary to consider the theory of *Erie Resistor* and *Great Dane*. It ordered ARA to reinstate the discharged helpers with back pay.

## II

■ We note at the outset of this appeal, that a tablehead and a helper enjoy a very

---

**2.** These sections, found at 29 U.S.C. § 158(a), provide in relevant part: "It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exer-cise of the rights guaranteed in section 157 …

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage mem-bership in any labor organization."

different legal status. The discharge of tableheads would be legal whether they are characterized as independent contractors or supervisory employees. Independent contractors, of course, are not protected by the Act and a company may terminate its relationship with its contractors without limitation, *see* 29 U.S.C. § 152(3). Supervisors likewise enjoy no protection, *id.*, and *Parker-Robb*, 262 N.L.R.B. 402, reaffirmed the settled principle that supervisors may be discharged for union activity. *See Florida Power & Light v. International Brotherhood of Electrical Workers*, 417 U.S. 790, 807–09, 94 S.Ct. 2737, 2746–47, 41 L.Ed.2d 477 (1974); *Beasley v. Food Fair of North Carolina*, 416 U.S. 653, 654–55, 94 S.Ct. 2023, 2024–25, 40 L.Ed.2d 443 (1974). In this case, the record leaves no doubt that the tableheads were supervisors, and we see no reason to question the conclusion that their discharge was legitimate.[3]

The discharge of their helpers is another matter. ARA defends its discharge of helpers on two grounds. First, it argues that tableheads are independent contractors and, consequently, helpers departed simply because their employers—the tableheads—were released. Second, ARA asserts that the evidence of anti-union animus in the discharge of helpers is insufficient to establish an unfair labor practice, and attempts to show a legitimate business practice whereby helpers always depart with their tableheads. For the reasons explained below, we reject these contentions and direct enforcement of the Board's order.

## A.

■ The Board's conclusion that ARA committed unfair labor practices by dis-charging the helpers rests upon its finding that the helpers were employees of ARA and not of the tableheads. This finding, in turn, is grounded in the characterization of tableheads as supervisory employees rather than independent contractors. ARA challenges that characterization here. On this question, the Board's decision, though "not one in which [it] had to apply its special expertise, should be upheld if the Board chose between two fairly conflicting views." *NLRB v. Tri-State Transport Corp.*, 649 F.2d 993 (4th Cir.1981). *See also, NLRB v. United Insurance Co.*, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968). Our examination of the record here convinces us that the Board did indeed choose between fairly conflicting views, and we accordingly affirm the finding that tableheads are employees of ARA.

In excluding independent contractors from the coverage of the Act, Congress intended that common law agency principles would govern the determination of employee/independent contractor status. *United Insurance*, 390 U.S. at 256, 88 S.Ct. at 989. Courts analyze this issue by applying the "right to control" test: "When the person for whom services are performed retains the right to control the manner and means by which those services are to be accomplished and particularly when that person provides supervision as to the details of the work, the workers are considered employees." *Air Transit, Inc. v. NLRB*, 679 F.2d 1095, 1098 (4th Cir.1982). *See also, Yellow Taxi Co. v. NLRB*, 721 F.2d 366, 374 (D.C.Cir.1983); *NLRB v. A.S. Abell Co.*, 327 F.2d 1, 4 (4th Cir.1964);

---

**3.** In *Parker-Robb* the Board abandoned its previous prohibition on supervisor discharges found to be part of a "pattern of conduct" to discourage rank-and-file employees from exercising section 7 rights. Instead, the Board concluded that the "incidental or secondary effect on the employees [from the discharge of a supervisor for union activity] is insufficient to warrant an exception to the general statutory provision excluding supervisors from the protection of the Act."

Even under *Parker-Robb,* an employer may not discharge a supervisor where that action "directly interferes with the section 7 rights of an employee." *Automobile Salesmen's Union,* 711 F.2d at 385. Thus, an employer may not discharge a supervisor "for giving testimony adverse to an employer's interest either at an NLRB proceeding or during the processing of an employee's grievance under the collective-bargaining agreement, ... for refusing to commit unfair labor practices, or because the supervisor fails to prevent unionization." *Parker-Robb,* 262 N.L.R.B. at 402–03. None of these circumstances is present here.

Restatement (Second) of Agency § 220 (1958). It is the right to control, rather than the actual exercise of control, that is significant. *NLRB v. Associated Diamond Cabs, Inc.*, 702 F.2d 912, 920 (11th Cir.1983). The test, however, is not narrowly focused on direct supervision, though of course such supervision is indicative of control. Instead, we must examine the relationship in its entirety, considering all the circumstances that suggest either employee or independent contractor status. *See Associated Diamond Cabs*, 702 F.2d at 919; *Tri-State Transport*, 649 F.2d at 995; *Associated General Contractors of California, Inc. v. NLRB*, 564 F.2d 271, 279 (9th Cir.1977).

Our examination of the relationship between ARA and the tableheads convinces us that the Board made a reasonable choice when it characterized tableheads as employees of ARA. We note that the company performs for the tableheads the kind of services one would expect from an employer. In contrast to cases where we have found independent contractor status, ARA makes all necessary payroll deductions for novelty personnel, including state and federal withholding taxes, Social Security, and worker's compensation. *Cf. Air Transit*, 679 F.2d at 1097; *Tri-State*, 649 F.2d at 996. There are other indicia of employee status as well. Tableheads must complete an employment application, sign in and out of work, abide by company rules contained in the ARA Employee Handbook, and face the customary sanctions of reprimand, suspension and discharge for infractions of those rules. Moreover, the tableheads perform in the name of ARA largely unskilled work of indefinite duration rather than a specialized and finite task.

Not only are many of the normal attributes of employment present in the relationship between ARA and the tableheads; many of the entrepreneurial attributes that one might expect in an independent contractor are absent. While the tableheads may vend novelty items at other locations, may use independent marketing techniques to enhance sales at their tables and bear the risk of loss or destruction of the novelty items entrusted to them, it is ARA that secures vendor's licenses, rents the space used by the tableheads, and designates what items and at what price the tableheads may sell.

In addition to this absence of tablehead discretion over price or product, all equipment necessary to perform the job is provided by ARA without charge to the tableheads. *See Restatement (Second) of Agency* § 220(3) and comment k. *Cf. Air Transit*, 679 F.2d at 1097; *Local 777, Democratic Union Organizing Committee v. NLRB*, 603 F.2d 862, 878 (D.C.Cir.1978). As noted by the ALJ, "a tablehead could report to an event without a penny in his pocket or a shopping bag at his side." ARA provides the tables on which novelty items are displayed, and gives the workers baskets to use when items are hawked in the arena. Tableheads do not purchase the items to be sold, and ARA bankrolls each tablehead with $50 in cash before an event so the tablehead can make change. ARA uniforms, required by the company's contract with Market Square, are also provided by ARA. In short, it is not necessary for a tablehead to make any personal investment to perform the task assigned to him. ARA's provision of the necessary instrumentalities further indicates an employer/employee relationship, not that of an independent contractor.

In considering the degree of control available to a putative employer, courts have also found relevance in the financial incentive of that party to exercise control. *See, e.g., Air Transit*, 679 F.2d at 1099; *Local 777*, 603 F.2d at 879. In *Air Transit*, for example, a taxi company charged drivers fixed fees unrelated to earnings. The fact that the company made "no attempt to share in a percentage of the drivers' earnings" created a strong inference that the company did not exercise control over the manner and means of the drivers' work. *Air Transit*, 679 F.2d at 1099. Here, ARA has every incentive to retain and exert control over tableheads, for it receives 90% of each tablehead's gross receipts from each event. Thus, ARA's own

profit depends upon both the success of tablehead operations and the strict procedures ARA imposes for maintaining and reporting tablehead receipts. ARA cannot simply give tableheads unbridled control over novelty operations, for it receives no fixed fee or rental on which it can depend. *Cf., Air Transit.* These financial incentives for control create a strong inference that ARA retains the right to oversee the manner and means of tableheads' performance.

ARA disputes the inference of control by stressing the areas in which tableheads enjoy flexibility and discretion in the performance of their work. Tableheads, for example, exercise substantial authority over helpers who work with them. Tableheads hire and fire helpers with little oversight by ARA. They determine the number of helpers hired and the number present at each event, set the helpers' pay, and decide whether helpers will work the tables or hawk novelty items in the arena. A tablehead can turn over his whole operation to helpers, for ARA does not require tableheads to be present at every event.

Though these facts suggest that tableheads actually exercise control over helpers, ARA has nonetheless retained at all times the right to control the tablehead/helper relationship. ARA's General Manager at Market Square, Gary L. Shipp, testified as to his ultimate authority over nearly every decision delegated to tableheads. Shipp indicated that he retained power to compel or prohibit hiring a certain helper, and could discipline or terminate a helper if he thought it necessary. Though tableheads enjoy flexibility in determining helper's compensation, ARA requires that helpers receive at least minimum wage, and Shipp stated that he had the power to require tableheads to pay helpers a certain percentage of their take. The fact that ARA does not routinely exercise its retained authority is not controlling, for, by definition, supervisory employees enjoy power to exercise some independent judgment over other employees on behalf of the employer. *See* 29 U.S.C. § 152(11); C. Morris, *The Developing Labor Law* 1452–

54 (2d ed. 1983). Only where an individual possesses such authority with genuine independence from the putative employer is independent contractor status indicated. The scope of ARA's retained authority supports the conclusion that tableheads are supervisory employees.

ARA argues further that any control it retained over tableheads was required by its contract with Market Square, and is therefore not relevant to the independent contractor issue. Courts have recognized that controls imposed by an employer to ensure compliance with governmental regulations "do not evidence an employee-employer relationship unless pervasive control by the employer exceeds to a significant degree the scope of the government imposed control." *Associated Diamond Cabs,* 702 F.2d at 922. *See also, Air Transit,* 679 F.2d at 1098; *Tri-State,* 649 F.2d at 995. ARA argues by analogy that the requirements of its contract should likewise be considered irrelevant on the issue of control by ARA, and several courts have suggested that this analogy is appropriate. *See Air Transit,* 679 F.2d at 1100; *SIDA of Hawaii, Inc. v. NLRB,* 512 F.2d 354, 359 (9th Cir.1975); *but see, City Cab of Orlando v. NLRB,* 628 F.2d 261, 264 n. 8 (D.C. Cir.1981). The contract here requires ARA to get arena approval of items for sale and their prices, to keep careful records of sales, to obtain all necessary permits and licenses, and to ensure that ARA personnel wear arena-approved uniforms. As indicated, however, ARA has retained power over the tableheads substantially in excess of that required to ensure compliance with its contract.

It is, of course, "a rare case where the various factors will point with unanimity in one direction or the other." *Merchants Home Delivery Service, Inc. v. NLRB,* 580 F.2d 966, 973 (9th Cir.1978). This case is no exception. We are nonetheless satisfied that the Board chose between two fairly conflicting views in characterizing tableheads as ARA employees. This characterization of tableheads applies as well to their helpers.

### B.

Having concluded that novelty helpers were employees of ARA, we now consider whether the company's discharge of these employees violated the Act. It is axiomatic that, under the Act, "an employer may dismiss an employee for good cause, no cause, or for any reason he chooses except the employee's union activity." *Torrington Co. v. NLRB*, 506 F.2d 1042, 1047 (4th Cir.1974). Whether a discharge was motivated by anti-union animus is a question of fact, and we must affirm the Board's determination if it is supported by substantial evidence on the record as a whole, even though we might have decided the case differently *de novo*. *NLRB v. Daniel Construction Co.*, 731 F.2d 191, 193 (4th Cir.1984); 29 U.S.C. § 160(e). Impermissible motive may be shown either by direct or circumstantial evidence. *NLRB v. Nueva Engineering*, 761 F.2d 961 (4th Cir. 1985). Review of the record here convinces us that the Board's finding of anti-union animus is supported by substantial evidence and we therefore direct enforcement of the Board's order.

Our analysis is structured by the burden of proof allocations sustained by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (approving the Board's decision in *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982)). The General Counsel bears the burden throughout to demonstrate that an employer's anti-union animus contributed to its decision to discharge employees. He must demonstrate that the employees were engaged in protected activity, that the employer was aware of the activity, and that such activity was a substantial or motivating reason for the employer's action. *Daniel Construction*, 731 F.2d at 197. An employer faced with such evidence may then prove by preponderant evidence that the worker would have been fired even in the absence of union activity. *Transportation Management*, 462 U.S. at 395, 103 S.Ct. at 2471. Thus, an employer might show that a worker's deficiencies, economic necessity, or a legitimate business policy compelled the discharge. Given the scheme of proof, we consider first the General Counsel's case of anti-union animus, and then turn to ARA's contention that the discharges resulted from operation of a legitimate business policy.

Both direct and circumstantial evidence support the conclusion that significant hostility toward the union on the part of ARA influenced the company's action. On several occasions, ARA's General Manager Shipp—who ultimately executed the discharge of tableheads—made his feelings about the union clear. After an event on February 4, 1982, Shipp was drinking with several tableheads and helpers when conversation turned to the union. He warned the employees, "Get your fucking union in and I guarantee you in six months all of you fuckers are gone. Now you put that in your fucking union meeting." Two weeks later, Shipp was asked by several employees to work out a dispute. He responded by asking, "Well, is that why all you assholes signed union cards?"

In addition, there is evidence tying this general anti-union animus to these specific discharges. The circumstances surrounding the discharges are suggestive of the company's motivation. The helpers were discharged two weeks before a scheduled election. Not only did this action remove approximately 15% of the voting unit from the election, it also posed a potential deterrent to other employees inclined to favor the union. *Cf. NLRB v. Instrument Corporation of America*, 714 F.2d 324, 330 (4th Cir.1983). Moreover, Shipp in effect admitted to at least one novelty helper that he had been fired for his union support. Kent Allensworth approached Shipp after his discharge and asked if he could take over the stand of his tablehead. According to Allensworth, Shipp asked why he should " 'give me the stand when he just fired my 'F"ing partner for the same reason?' And I said, 'What's that?' He said, 'Signing a union card, an organizer's card.' " Thus, it is clear that ARA's hostility toward union

organizational activity played a significant part in its decision to discharge helpers.

ARA contends, however, that the evidence was insufficient to show its awareness of the union sympathies of all the fired helpers. The record before us does indeed reveal only ARA's specific knowledge of union support by four of the discharged helpers. Nevertheless, the evidence as a whole supports the conclusion that the other fourteen helpers were discharged in violation of the Act as well.

 Where an overall decision to discharge has been found to be prompted by organizational activity, individual discharges may be ascribed to that same cause where, as here, the employer has actual knowledge of some employees' union activity, and a reasonable suspicion that other terminated employees were among the union's supporters also. *Cf. Dillingham Marine & Mfg. Co. v. NLRB*, 610 F.2d 319, 321 (5th Cir.1980). Here, it is clear that ARA knew union activity centered among the novelty workers. Initial union efforts concentrated solely on novelty vendors, and the union first sought a unit comprised only of these employees. Union disclosures to ARA revealed that the organizing committee was comprised largely of tableheads and helpers. In a speech to food and beverage employees, ARA Vice-President Pistone acknowledged the company's view that "the problem was just with novelty people." Thus, though ARA was perhaps not aware of each and every helper's union views, it was aware of a concentration of union sympathies among novelty vendors. Given the other evidence of ARA's animus, motivation, and specific knowledge, we find its general knowledge of union support among novelty employees sufficient to uphold the Board's decision. It is reasonable to conclude that ARA simply seized the moment to wipe out a pocket of suspected union support without waiting for actual confirmation that each employee discharged actually supported the union.

ARA responds that legitimate business concerns required the simultaneous departure of tableheads and helpers. It contends that its policy is grounded in the necessities of the working relationship between tableheads and helpers. Tableheads trust helpers to handle large sums of money efficiently and honestly in the tablehead's absence or in hectic circumstances where close monitoring is impossible. Tableheads therefore must have freedom to work with helpers of their own choosing. Accordingly, the company argues, the job of the helper depends on that of his tablehead. If the tablehead is terminated, the helper is discharged as well.

The policy ARA advances no doubt reflects a plausible approach to these relationships. Unfortunately for ARA, however, the record provides inadequate evidence for us to conclude that this policy was a reality at Market Square. In fact, the evidence provides at least as much support for concluding that ARA replaced tableheads with their helpers rather than discharging them simultaneously. In the related representation case, Shipp testified on three separate occasions that when a tablehead left his position, ARA policy was to replace the tablehead with one of his helpers. He recalled at least one example of the operation of this policy, though he denied the existence of such a practice in proceedings below. The ALJ found no instances prior to this case where ARA "terminated a novelty worker solely because the tablehead with whom he or she worked departed from ARA's employ."[4] On this record, we are unable to conclude that the helpers would have been discharged in the absence of ARA's anti-union animus, and

---

**4.** ARA contends that the testimony of Judith Selig, novelty supervisor at Market Square from 1974 to 1981, demonstrates that helpers and tableheads departed together. During Selig's tenure, however, novelty vendors were not designated as either helpers or tableheads. Selig testified that she hired novelty workers as equal partners, frequently employing husband and wife to work as a team. Because of this relationship, both members of the team left ARA at the same time. Where only one team member left, Selig testified, the other team member continued to work the table. Selig was unable to testify that helpers replaced tableheads only because no individuals were so designated.

accordingly affirm the Board's findings that the discharges violated sections 8(a)(1) and 8(a)(3).

### III

Finally, ARA contends that hostility, bias, and prejudgment by the ALJ require that we remand this matter to a different ALJ for *de novo* consideration. While the record indeed reveals that the ALJ exercised little patience and a sharp tongue, it also shows that he neither played favorites nor directed his ire at only one party. Moreover, his written decision demonstrates careful and balanced consideration of the evidence before him. We accordingly are unwilling to direct the drastic course of action requested by ARA.

### IV

We have examined the various issues in this case and find the conclusions of the Board supported by the evidence. Accordingly, the order of the Board is hereby ENFORCED.