940 F.2d 652
 138 L.R.R.M. (BNA) 2104
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
HI-WAY PAVING COMPANY, INCORPORATED, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
HI-WAY PAVING COMPANY, INCORPORATED, Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Petitioner.
 Nos. 90-2348, 90-2371.
 United States Court of Appeals, Fourth Circuit.
 Argued Nov. 1, 1990.
Decided Aug. 14, 1991.
As Amended Oct. 22, 1991.
 
 On Petition for Review and Cross-application for Enforcement of an Order of the National Labor Relations Board.
 Charles R. Volk, Volk, Frankovitch, Anetakis, Recht, Robertson & Hellerstedt, Pittsburgh, Pa. (Argued), for petitioner; Jane L. Volk, John A. McCreary, Jr., Volk, Frankovitch, Anetakis, Recht, Robertson & Hellerstedt, Pittsburgh, Pa., on brief.
 Richard Cohen, National Labor Relations Board, Washington, D.C. (Argued), for respondent; Jerry M. Hunter, General Counsel, Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Howard E. Perlstein, Supervisory Attorney, National Labor Relations Board, Washington, D.C., on brief.
 NLRB
 ENFORCEMENT DENIED.
 Before DONALD RUSSELL and NIEMEYER, Circuit Judges, and JOSEPH H. YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 DONALD RUSSELL, Circuit Judge:
 
 
 1
 This is an unusual union discrimination case: seldom do we have a case where the defendants are both the Union and the Employer. The complainant, William Kress, on behalf of himself and his brother, Edward Kress, after filing a claim of discrimination initially on April 12, 1988, later, on June 20, 1988, filed two new separate charges of unfair labor practices. The first charge was filed against the respondent Hi-Way Paving Company ("Employer") for refusing to employ them because of their prior engagement "in concerted activities with other employees of said employer for the purpose of collective bargaining" and "in order to discourage membership in said labor organization," in violation of Section 8(a)(1) & (3) of the National Labor Relations Act. The second charge was filed against Kress' Union, the Teamsters Local 341 ("Union"), because "the above-named labor organization, by its officers, agents and representatives," in violation of Section 8(b)(1)(A) of the Act, had filed improper intraunion charges against William Kress and Edward Kress and, in violation of Section 8(b)(2) of the National Labor Relations Act, had "requested that Respondent Employer refuse to hire employees William P. Kress and Edward A. Kress," and, also in violation of Section 8(b)(1)(A) of the Act, had refused "to refer and continue[d] to fail and refuse to properly refer William P. Kress and Edward A. Kress for employment at Respondent Employer, "and did so because the two had "engaged in dissident union activities and/or other concerted activities...."
 
 
 2
 The National Labor Relations Board issued its Amended Complaint on these substituted June 20 charges in December, 1988. Since the charges against the Union and the Employer arose from much the same events and involved largely related facts, the Board without objection consolidated the two charges for hearing and disposition by a designated administrative law judge.
 
 
 3
 An evidentiary hearing on the charges was held by the administrative law judge. After the hearing, the administrative law judge filed his report, finding (1) that Kress' resort to internal disciplinary procedures and his filing of National Labor Relations Board charges were protected actions under the National Labor Relations Act and that the Local had violated Kress' rights in holding otherwise, and (2) that the Local Union had violated Kress' rights by denying him access to the Local's job referral lists. Charges by Kress relating to the improper imposition of a fine by the Local's Trial Board for Kress' misconduct at Union meetings were dismissed. The administrative law judge found that the charge that the Union had requested the employer not to hire the Kresses had not been proved, and he dismissed the charge. In connection with the charges against the Employer, the administrative law judge found that the Employer had violated Section 8 of the Act by refusing to hire William and Edward Kress on June 15, 1988, "because William Kress had complained concerning failure to observe conditions of work set forth in the governing collective bargaining agreement" while he had been working for the Employer in late 1986.
 
 
 4
 This Report of the administrative law judge was adopted on appeal by the Board. The Union has not petitioned for review of the Board's decision, but the Employer has, contending that it had not violated the rights of Kress to engage in concerted activities nor had it retaliated by refusing to hire the Kresses in 1988 because William Kress had exercised, in 1986, the right to engage in concerted activities. It further contended that, whether it had so acted, there were abundant reasons for refusing to employ William Kress independent of any discriminatory charges by Kress. For the latter reason, we deny enforcement of the order of the Board.
 
 I.
 
 5
 Though, as we have said, the Union has not appealed the decision of the administrative law judge against it, we feel it would be helpful in reviewing the charges against the Employer to examine the evidence and the report of the administrative law judge on the charges against the Union for the insight they may provide as to William Kress' personality, work habits, ability to get along with others on the projects, and suitability for employment. We, therefore, begin by reviewing the evidence and the rulings by the administrative law judge on the Union charges. We are additionally persuaded of the propriety of this action because the evidence and findings on the charges of the Union were incorporated in the appendix as relevant to this appeal.
 
 II.
 
 6
 The charges against the Local, as summarized in the opinion of the administrative law judge, were that it and its officers had engaged in a "pattern of illegal coercion and discrimination calculated to intimidate [Kress] and a small group of members, who were outspokenly critical of the union membership."[1] Perhaps in terms of relevancy here, though, the primary charges against the Union were the second and third claims stated by the Board's amended complaint. These claims were that the Union had successfully requested the Employer not to employ William Kress and had denied him access to the Union's referral list for the Employer's job.
 
 
 7
 It is clear from the evidence and from the charges filed against the Local Union that there had been constant problems between the Local officers and William Kress. This would seem to have been inevitable, given what the administrative law judge found to be Kress' "argumentative nature," "aggressive manner," and "abusive stance" in all his dealings. This disposition of Kress was illustrated by his record of flagrant misconduct at Union meetings as recognized by the administrative law judge who, in his report, found that:
 
 
 8
 Anyone mindful of Kress' behavior during union meetings would grasp the limits of Swarmer's stated concern.[2]
 
 
 9
 Kress' uncontrollable and disruptive behavior was a matter of common knowledge, and the General Counsel registers no affirmative claim that his deportment at union meetings was within protected parameters.
 
 
 10
 (Emphasis added). The administrative law judge followed up this statement with the additional finding: "I have no doubt that Kress, during Union meetings, frequently carried his argumentative nature beyond rational and controllable limits, that abusive personal attacks were part of his style, and that his disruptive behavior at the meetings undoubtedly presented an ongoing problem to Swarmer and others interested in a semblance of decorum."
 
 
 11
 The Local, understandably frustrated by Kress' repeated misconduct, began inquiring whether it could validly discipline Kress for these "uncontrollable" tirades at the Union meetings, which made it practically impossible to transact Union business in a rational manner. The administrative law judge went on to supply in his report significant instances of William Kress' misconduct both within the Union and on the job, all of which fully prompted this feeling of the Union toward Kress. As described by the administrative law judge, Kress had, for instance, assumed the role of a self-anointed enforcer of the Union's jurisdictional rights throughout the projects on which HiWay was a subcontractor during his 1985 and 1986 employment by Hi-Way. He pursued this self-anointed task with zeal, even leaving his Hi-Way job in an effort to ferret out alleged union jurisdictional violations throughout the entire job by contractors other than Hi-Way.[3] In this quest, he acted on his own and seldom, if ever, involved the Union, though his brother was the steward for the 1986 Hi-Way job, concerned with safeguarding the provisions of the collective bargaining agreement. He repeatedly charged the Union officers with slothfulness in policing what he individually perceived to be violations of the collective bargaining agreement throughout the job. In testifying about these activities, he "was plagued," in the words of the administrative law judge, "by pre-conceived notions [as to alleged violations], a penchant for testifying as to facts beyond his knowledge, and a general argumentative demeanor which precluded any confidence in his objectivity." The administrative law judge expressed the opinion that William Kress was not "a reliable witness." He supported that finding with this statement: "It was my distinct impression that his testimony was distorted in major proportion by his combative nature, his obsession with a need to prevail and desire to make it as difficult as possible for those who might stand in his way," and by his aggressive effort "to enforce his perceptions in his own way from a highly abrasive stance both on and off the job." So egregious, arrogant and abrasive was Kress' conduct during Union meetings that the administrative law judge concluded that "Kress' otherwise protected activity during union meetings was converted to unprotected activity by virtue of his disruptive behavior." (Emphasis added).[4] Also, the administrative law judge deduced that this was the view of the General Counsel of the Board, as another statement of the administrative law judge demonstrates:
 
 
 12
 Deletion of the misconduct issue is taken as deliberate and hence with prejudice. The General Counsel, at all times, was on notice that Swarmer had acted on this ground. As a documented fact, this could not have escaped attention when the allegations were investigated prior to issuance of the complaint. In this posture, it is assumed that the Respondent Union is relieved of any burden of demonstrating that Kress' otherwise protected activity during union meetings was converted to unprotected activity by virtue of his disruptive behavior.
 
 
 13
 There were discussions among the officers about retaining counsel in an effort to recover costs from Kress for the expenses and loss of time suffered by the Local and its officers in responding to Kress' generally improper or frivolous charges. Finally, Swarmer, acting for the Local, filed formal charges against Kress in early 1988 for the purpose of expelling Kress from the Union. The charges were based on "(1) the latter's [Kress'] disruptive behavior at Union meetings, (2) his filing of internal Union charges against officers, and (3) his disruptive behavior on projects, thus, making him 'almost unemployable.' " (Emphasis added). A trial board at the Local level was convened to hear those charges. Kress was found guilty on the first of the charges. The third charge was apparently either overlooked or disregarded. A later charge of improper denial of access to the Union referral lists was sustained. Kress appealed the Board's decision to the Joint Council under the Union constitution.
 
 
 14
 The Joint Council, as the administrative law judge describes it, construed the challenge to the conduct set forth in the second claim in Swarmer's petition to be a charge "based upon a member's [Kress'] resort to internal disciplinary processes and the National Labor Relations Board." Though expressing sympathy with the Local "for having to endure what obviously appears to be rude and contemptuous conduct," the Council felt that such conduct was protected by the free speech provisions of the Landrum-Griffin Act and dismissed the charge of the Local in this regard. It made no ruling on the Local Union's third charge.
 
 
 15
 This opinion of the Judicial Council on the Union's internal charges against William Kress was issued sometime after July 7, 1988. In the meantime, William Kress had filed his second set of charges with the Board against the Union, which we have already summarized. At the hearing before the administrative law judge in December on the later charges, the General Counsel appears to have made as his primary claim against the Local, that its president, Swarmer, requested Hi-Way not to employ William Kress and his brother Edward, and that Hi-Way complied. The only evidence in support of this serious charge was the testimony of William Kress that Field, when he refused to employ Kress, told him that (Field's) refusal was in response to Swarmer's request that he (Kress) not be employed. It appears that it was on this testimony that the General Counsel predicated his primary charge against the Union. Field denied any such comment or request made to him by Swarmer. The administrative law judge accepted Field's testimony as truthful and correct, and, having found that William Kress was not "a reliable witness" whose "preconceived notions" of the facts ran far wide of the actual facts, refused to accept Kress' version. He accordingly proceeded to dismiss this particular charge. The administrative law judge did find the charge relating to the Local's refusal to make its job referral lists available to Kress proved, and he sustained that charge.
 
 
 16
 The Union did not appeal the findings by the administrative law judge against it (i.e., the free speech claim and the access to job referral lists). Even though this made moot the findings about the Union, Kress' conduct and the administrative law judge's findings in disposing of those charges appear important as evidence of Kress' conduct and attitude both in the Union and in the workplace and are important in weighing the qualifications of Kress in his application for employment by Hi-Way in 1988. We accordingly turn now to the charges against Hi-Way, which were upheld by the administrative law judge.
 
 III.
 
 17
 The petitioner Hi-Way, the employer-defendant in the Board's charges, is an Ohio corporation with headquarters in Hilliard, Ohio.
 
 
 18
 It is engaged in the business of road paving, generally on public projects, in Ohio and throughout the eastern United States, including, as relevant to this case, the Pittsburgh area of Pennsylvania. Road paving is a seasonal business, conducted in those weather periods appropriate for such work. Because of this, the Employer maintains a relatively small core of salaried workers at its headquarters; it employs on an hourly basis other employees from time to time, drawn normally from the local job market where its project is located. Since it is a union employer, it, as a rule, works with the appropriate Union Local in securing these hourly wage employees in the area through lists supplied by the Local.
 
 
 19
 The Employer had earlier engaged in road work in the Pittsburgh area from October to December in 1985 and from May to September in 1986. William Kress and Edward Kress had been employed as hourly wage employees engaged in truck driving during each of these jobs. An event occurred two or three days after William Kress' employment had terminated in September, 1986, which the administrative law judge later emphasizes in some of his findings. On that occasion, Kress telephoned Yinger collect. He told Yinger that he had been on the job and he had seen a "laborer" driving "his truck" hauling material. He said he was entitled to four or five days' pay under the collective bargaining agreement. As detailed by Kress, Yinger told him he would investigate and call him right back. A little later Yinger did call Kress back, telling him, according to Kress (Yinger died in late 1987), that he was right and that Yinger would pay him for three ten-hour wage days, "take it or leave it." Kress took the offer. However, apparently while he was considering Kress' call, Yinger came into Field's office next door and he "mentioned about this argument with Billy--the job is done, he has been laid off, and here he is saying we owe him six days pay or something. And he said, 'I am going to fight the son of a bitch. I know I could win, but I think I will just settle with him and get him to sign something and just get rid of him.' He said, 'I will never work that son of a bitch again.' " However, William Kress had inquired whether his claim for this extra pay would affect his later employment by Hi-Way, and Kress testified that he had been assured by Yinger that it would not. Yinger, according to Kress, had denied that the incident would prejudice possible reemployment by Kress, and again, according to Kress, had declared that he intended to hire Kress if he had any more work in the Pittsburgh area.
 
 
 20
 The Employer secured no work in the Pittsburgh area in 1987. However, it obtained a subcontract under S.J. Groves, the general contractor, on what was spoken of as the "downtown" project in the Pittsburgh area. The Employer was only one of several subcontractors on the job. Work under this subcontract by the Employer was to begin in June, 1988. Prior to his death in an automobile accident in late 1987, Alvin Yinger, the Employer's executive vice-president, based at company headquarters in Hilliard, Ohio, had been in charge and supervised all work in the Pittsburgh area. Following Yinger's death in late 1987, Joel Field, who was the Employer's chief engineer, succeeded to Yinger's responsibilities.
 
 
 21
 In the early months of 1988, planning for the Groves' project began among the officials of the Employer at its headquarters. Participating in one of these planning sessions were Allen Moore, the Employer's treasurer; Vern Esposito and Ray Brenn, two assistant superintendents who had worked on both of the Employer's previous jobs in the Pittsburgh area in 1985 and 1986; and perhaps several others. The participants in the conference testified that Field, who was to be in actual charge of the project, naturally was present at the time. Among other subjects the participants discussed was the employment of the hourly wage employees. William Kress and his "exploits" and "misconduct" were discussed in some detail on that occasion.
 
 
 22
 Field, on his own, sometime before he began hiring in June, 1988, secured a list of all the employees who had been employed by the Employer on its 1985 and 1986 jobs in the Pittsburgh area. This list, of course, included the name of William Kress. Field made inquiries among his supervisory staff about all these employees, including William Kress. Later, before commencing employment of the hourly wage employees in June, 1988, Field contacted Dennis Swarmer, the president of Local 341. The purpose of such meeting was to agree on a procedure satisfactory with the Local for the selection process for the hourly wage employees. It was agreed at the time that selection would generally be made from job referral lists submitted by the Local. Field agreed that all selected for employment would be submitted to Swarmer, who presumably might object. Whether Swarmer's objection would operate to prevent an employee from being hired was not developed in the evidence. Nor is there any evidence other than that of Kress (which the administrative law judge refused to credit) that Swarmer ever objected to the employment of any particular individual. Field, however, did request that Swarmer not include in the referral list submitted to him the names of William and Edward Kress. Swarmer made no objection to Field's request, but asked that Field put his request in a letter. Field promptly complied, writing Swarmer on June 17, 1988, the following letter:
 
 
 23
 As discussed, Mr. Buddy Kress was employed by Hi-Way Paving, Inc. during the 1986 construction season. We found his work habits to be disruptive and cause considerable dissension among the work force. In general, he was an unsatisfactory employee.
 
 
 24
 Please do not refer our company to him as an opportunity for employment as we will not hire him.[5]
 
 
 25
 Two days before this letter was written, William Kress, on his own, had applied to Field for employment as a truck driver. Field had told Kress he would not employ him. Field's reasons for such refusal, as given both William Kress and his brother Edward, have already been detailed by us supra and need not be repeated here.
 
 
 26
 William Kress, on June 20, filed his charges with the Board against the Union and the Employer. In his decision on such charges, the administrative law judge, after hearing the evidence, found an unfair labor violation by the Employer in this case. He began by identifying the case as a "mixed motive" case or, as we in our decisions generally describe such a case, a "dual motive" case. We in this Circuit have often addressed the rule to be applied in such cases and have set forth an analytical process to be followed in their resolution. As phrased by us in NLRB v. Nueva Engineering, Inc., 761 F.2d 961, 967 (4th Cir.1985), and reaffirmed in our latest case on the subject, Standard Products Co. v. NLRB, 824 F.2d 291, 296 (4th Cir.1987), the rule in this "dual motive" case is:
 
 
 27
 The Supreme Court has affirmed, as a uniform standard, that where an employer's opposition to protected activity is shown to be a substantial or a motivating factor in the decision to take adverse action against an employee, the employer will be found to have violated the Act unless the employer is able to demonstrate that the adverse action would have occurred in the absence of the employee's protected conduct.
 
 
 28
 Nueva Engineering, 761 F.2d at 967 (citing NLRB v. Transportation Management Corp., 462 U.S. 393 (1983)) (emphasis added). And, in ARA Leisure Services, Inc. v. NLRB, 782 F.2d 456, 462 (4th Cir.1986), Judge Wilkinson set forth with more precision the proper analysis to be used in an allocation of the burden of proof in these cases. He wrote:
 
 
 29
 The General Counsel bears the burden throughout to demonstrate that an employer's anti-union animus contributed to its decision to discharge employees. He must demonstrate that the employees were engaged in protected activity, that the employer was aware of the activity, and that such activity was a substantial or motivating reason for the employer's action. Daniel Construction, 731 F.2d at 197. An employer faced with such evidence may then prove by preponderant evidence that the worker would have been fired even in the absence of union activity. Transportation Management, 462 U.S. at 395, 103 S.Ct. at 2471. Thus, an employer might show that a worker's deficiencies, economic necessity, or a legitimate business policy compelled the discharge.
 
 
 30
 Id. We apply those standards to the facts of this case.
 
 
 31
 That there was in this case a demonstration by the Employer that the refusal to employ Kress "would have occurred in the absence of the employee's protected conduct" seems beyond dispute. And the administrative law judge recognized this fact. He expressly found that Kress "was a contentious individual, whose behavioral patterns were not limited to intraunion disputes. [Kress'] own testimony confirms his provocation of quarrelsome incidents in the workplace. Thus, this is not a case where management has no comprehensible basis for action independent of union involvement." Even Kress' Local recognized Kress' unsuitability. Thus, the Local had sought to expel Kress from the Union, and one of its grounds was that Kress' "disruptive behavior on projects, thus, [made] him 'almost unemployable.' " As we have said, the administrative law judge also found that "Kress' uncontrollable and disruptive behavior [in the Union] was a matter of common knowledge" and went beyond "protected parameters." He found that Kress' style both in the Union and the workplace was marked by an "argumentative demeanor," and his "highly abrasive stance" on all occasions made him an unsatisfactory Union member. The administrative law judge recognized this, because he stated as a finding that Kress "was a contentious individual, whose behavioral patterns were not limited to intraunion disputes," implicitly finding that the same misconduct tainted his conduct in the workplace. In fact, there was express testimony that Kress' conduct on the Employer's jobs had followed "behavioral patterns" similar to those which marked his conduct as a Union member. The Employer went further and presented evidence of specific instances of Kress' misconduct and incompetency when he had earlier worked for the Employer. The administrative law judge even noted some of these instances of Kress' "misconduct" and "incompetency" on the job, such as "operat[ing] vehicles in hazardous fashion" and "erratic and unsafe driving." Specifically, there was an incident cited by the witnesses and described in the report of the administrative law judge as one "in which Kress, first, operated his vehicle at a high rate of speed, dumping a segment of his load in the process, then on reloading, deliberately collided with a lift truck, finally almost striking" his supervisor. Another incident was commented on by the administrative law judge and testified to by witnesses at the hearing. In this incident, "a co-worker narrowly escaped serious injury in consequence of Kress' erratic and unsafe driving." The administrative law judge found that "there is little doubt that the misconduct attributed to Kress by employer witnesses probably took place as described, or in some lesser form."[6] There also was evidence that other employers in the construction field had found Kress an unsatisfactory employee. Several weeks before Hi-Way wrote its letter requesting the Local not to refer Kress to it for employment, the Acme Construction Company, engaged in the same business as Hi-Way, had written the Local requesting the Local not to refer Kress to it for employment.
 
 
 32
 In the face of all the misconduct in Kress' work record and the findings of the administrative law judge, it is inconceivable that any contractor would have hired Kress had he known of this record as detailed by the administrative law judge.[7] And the administrative law judge recognized this, for he said that, "if these individuals [i.e., the Employer's witnesses] relayed their experiences on a timely basis, and in detail, Field [would have been] alerted not only to [Kress'] abusive behavior and incompetent performance, but he would also have been afforded insight into William Kress' propensities to raise craft jurisdictional issues and other grievances," and he might have known of Kress' "combative nature, his obsession with a need to prevail and desire to make it as difficult as possible for those who might stand in his way" and his habit and style of pressing his own "perceptions ... from a highly abrasive stance." See note 4, supra. Moreover, the evidence of the conduct of other contractors bulwark this showing of the suitability of Kress for employment.
 
 
 33
 It appears undisputed that this record, as found by the administrative law judge himself, establishes that Kress was an unsatisfactory employee who, in his previous employment by Hi-Way, had been guilty of what the administrative law judge characterized as "misconduct" and "incompetency" on the job. That, it would seem, should be the end of the case, for those findings reveal that, despite any claim of a questionable unfair labor practice on the Employer's part, Field would in any event not have employed Kress. Standard Products would require the dismissal of the charge against the Employer by the rule therein stated under those circumstances. The administrative law judge, however, sought to escape this result by declaring that Field solely made the decision to refuse to hire Kress and that he was ignorant of Kress' previous "misconduct" and "incompetency" and knew only of Yinger's statement in Field's presence two years earlier. Thus, under the law judge's analysis, the sole reason Field, some two years later, refused to employ Kress was his recollection of Yinger's statement. In reaching this conclusion, the administrative law judge, without any real evidence to support his scenario and in the face of a mass of contradictory testimony both direct and circumstantial, found that Field was completely uninformed of the overwhelming evidence of Kress' "misconduct" and "incompetency" during his earlier employment by Hi-Way. It is important to recognize that Field did not assume the obligation of selecting hourly wage employees for the Pittsburgh job until the first of 1988, some two years after Yinger's statement on which the administrative law judge relies so much and a few weeks after Yinger's death. When given that responsibility, Field apparently took his responsibility seriously. One of his first acts was to call for a list of all the hourly wage individuals previously employed by Hi-Way on its Pittsburgh jobs. Kress' name was, of course, on this list. It can be reasonably inferred by his later action that he investigated the names on this list and sought information from those who had had immediate supervision of these former employees' work and were acquainted with their suitability as employees. Unless he had done that, he could not have prepared a list of those former employees he particularly wanted to employ as well as any he did not want to employ. He gave the Local Union president the names of those former employees he wanted referred to him for employment and the names of two he did not wish referred to him, i.e., the two Kresses. Field testified he made his decision based on what he had been told by others with knowledge of the employees. He identified some of the persons from whom he had secured information on which he based his decision not to hire Kress.[8] And these individuals are the persons from whose testimony the administrative law judge made his finding that Kress had been guilty of misconduct and incompetency. These witnesses, along with others, testified. They testified to telling Field of this misconduct and incompetency of Kress before Field began receiving employment applications in early June, 1988. There was also testimony of a conference attended by most of Hi-Way's supervisory personnel where the plans for carrying out the "downtown" job were canvassed. The employment problem was discussed and, in connection with that discussion, several of the participants brought up the name of Kress and reviewed his prior misconduct on the job. The witnesses identified Field as present at this conference, and this was as expected, because Field was the individual who was to have complete supervision over the job. There was no contradiction by any witness of all this testimony. Nor was there any evidence in the record to put in issue the credibility of the witnesses who had testified to Field's knowledge of Kress' suitability for employment. The administrative law judge found all the supervisory witnesses credible witnesses on Kress' misconduct and incompetency on the job, and he based his finding that Kress had been guilty of misconduct and incompetency on the job on the testimony of these witnesses. But he--without assigning any articulated reason--refused to accept their testimony that they had discussed Kress with Field before he began his hiring process. Similarly, the administrative law judge refused to accept Field's testimony that he based his decision to refuse to hire Kress on the misconduct and incompetency reported to him by other employees. Yet, when there had been a flat contradiction between Field and Kress on whether the Local Union had requested Field not to employ Kress (the primary charge by Kress against the Local Union), the administrative law judge chose to believe Field and to disbelieve Kress. We find this action by the administrative law judge inexplicable.
 
 
 34
 It is true the administrative law judge seeks to support his finding that Field did not know of Kress' misconduct when he refused to hire him on June 15 by two circumstances. The first is that Field had no "first-hand knowledge" of the misconduct of Kress. We confess some question in our minds as to what the administrative law judge meant by "first-hand knowledge." If he meant personal knowledge based on actual observation of such incidents, it may be accepted that Field did not have such knowledge. He was seldom on the Pittsburgh jobs prior to 1988, and, when he was, his interest was largely limited to his own responsibility. But if, by the term, the administrative law judge meant he had not been told by persons whose reliability he trusted about the misconduct, then, as we have seen, there was overwhelming, undisputed evidence that he had received such reports. And he had a right to rely on such reports in arriving at his decision, especially when, as here, it is found that the information is accurate. Most employment decisions are made entirely or partially on information procured from others, and there is nothing wrong with the practice.
 
 
 35
 The second basis for the administrative law judge's refusal to credit Field's testimony (he offered no reason to question the credibility of the other witnesses on Field's knowledge) was that Field had difficulty in recalling the details of the misconduct. This was not unusual considering the number of the incidents and of their details. Moreover, there was no reason for Field to have charged his memory with the details of all the instances of misconduct by Kress on the prior jobs. He had received the information from his supervisors on the job. They were supervisors who had worked with Kress earlier and who were to work with him on the job over which Field had supervision. He trusted and relied on their credibility and on their judgment. It is understandable that he relied substantially on their final judgment. These supervisors backed up their judgment with testimony of previous misconduct by Kress which the administrative law judge found acceptable. Field did the same. We do not think his action can be faulted.
 
 
 36
 In summary, we think the evidence shows that Field was cognizant of Kress' misconduct and incompetency before he reached his conclusion not to hire Kress and that this misconduct and incompetency fully supported Field's decision not to employ Kress on June 15, 1988.
 
 
 37
 It follows that enforcement of the Board's order for the reinstatement of William Kress with backpay is denied. Whether there is any claim by Edward Kress for backpay for the period between the date he was denied employment and the date he was subsequently hired is reserved for decision if pressed by Edward Kress.
 
 
 38
 ENFORCEMENT DENIED.
 
 
 39
 NIEMEYER, Circuit Judge, and JOSEPH H. YOUNG, Senior District Judge, joined.
 
 
 
 [1]
 Originally, both William and Edward Kress were denied employment. Field quickly determined, however, that Edward was a satisfactory employee and that, therefore, he had been selected as one not to be hired only because he was William's brother. This is true of the conflict with the Local Union. There was apparently no conflict between the Local Union and Edward Kress. In fact, Swarmer, the president of the Local Union, had appointed Edward the Local's steward on the Hi-Way jobs, and Edward acted as such during all the time Hi-Way had been working on jobs in the Pittsburgh area during 1986. The error in denying Edward employment was promptly corrected, and Edward was employed by Hi-Way until the end of the project. Thus, the only complaint remaining was that of William Kress. Subsequent references to the claim will refer only to William and will not include Edward
 
 
 [2]
 Swarmer was the Local's president
 
 
 [3]
 Many of his complaints dealt with another subcontractor, Holam Construction Co., in particular. Whether Holam was bound by the Teamster contract is not discussed by the administrative law judge
 
 
 [4]
 See NLRB v. City Disposal Systems, Inc., 465 U.S. 822, 837 (1984). "An employee may engage in concerted activity in such an abusive manner that he loses the protection of Sec. 7" to be protected in concerted activity. (Brennan, J.)
 Also, the administrative law judge, in his opinion, said that "the Board has upheld the legitimacy of discipline where, in the course of protected activity, an employee engages in conduct so excessive as to render him unfit for future employment." Bettcher Manufacturing Corporation, 76 N.L.R.B. 526, 527 (1948); Caterpillar Tractor Co., 276 N.L.R.B. 1323, 1326 (1985).
 
 
 [5]
 This letter refers only to Buddy Kress, which was an abbreviation of Edward Kress' name. The reference, however, obviously related to William or Billy Kress, and the use of the name Buddy Kress was an error in typing. That this is so is recognized by all the parties to this controversy. Further, this letter is substantially the same as one written to Swarmer at the end of March 1988, by Acme Construction Co. Acme made the same request of Swarmer as had Field
 
 
 [6]
 Also in his report the administrative law judge had noted that testimony that Field had been told of these incidents "arous[ed] suspicion." However, as the above-quoted comment makes clear, he found the testimony regarding the details of misconduct accurate. What he found objectionable in these accounts was the testimony of the witnesses that Field was told of the incidents before June 15, 1988. That testimony contradicted the flimsy theory on which the administrative law judge sought to justify erroneously his finding of a labor violation by the Employer, and it was for that reason that he said the sworn testimony of some six or seven witnesses was "suspicious."
 
 
 [7]
 In addition, Kress, in his own testimony, identified a number of local contractors who had, sometime before he applied in June, 1988, for employment by Hi-Way, fired him. This evidence supports the Local's statement that Kress' "disruptive behavior on projects ... [made] him 'almost unemployable.' "
 
 
 [8]
 For reasons explained in note 1, supra, this discussion is limited to William Kress