GOLDTEX, INCORPORATED,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

GOLDTEX, INCORPORATED,
Respondent.

Nos. 93–1039, 93–1139.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 9, 1993.

Decided Jan. 31, 1994.

**ARGUED:** Terry Allen Clark, Edwards, Ballard, Clark & Barrett, P.A., Winston–Salem, NC, for Petitioner. Vincent J. Falvo, Jr., National Labor Relations Board, Washington, DC, for Respondent. **ON BRIEF:** Thomas H. Keim, Jr., Edwards, Ballard, Clark & Barrett, P.A., Winston–Salem, NC, for Petitioner. Jerry M. Hunter, Gen. Counsel, Yvonne T. Dixon, Acting Deputy Gen. Counsel, Nicholas E. Karatinos, Acting Asso-

ciate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Peter Winkler, Supervisory Atty., National Labor Relations Board, Washington, DC, for Respondent.

Before WILKINSON and HAMILTON, Circuit Judges, and NORTON, United States District Judge for the District of South Carolina, sitting by designation.

## OPINION

WILKINSON, Circuit Judge:

■ We review here the National Labor Relations Board's findings that four employees of petitioner corporation were discharged in violation of §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act ("Act"), 29 U.S.C. §§ 158(a)(1) & 158(a)(3). We hold that the Board's order with respect to three of the employees cannot stand because the Board has failed to show that those layoffs were motivated by the employer's anti-union animus. In discharge cases, failure to show that layoffs were intended to discourage union membership or activities precludes a finding that the discharges were impermissible. Because substantial evidence does support the Board's decision with respect to one of the discharged employees, its order will be enforced in part.

## I.

Goldtex, Inc. operates a textile printing facility in Goldsboro, North Carolina. In late 1989, the Amalgamated Clothing and Textile Workers Union initiated an organizational drive at Goldtex. This drive ended with the union's defeat in a March 1, 1990, representation election. During the course of the union's campaign and in the year following the election, Goldtex engaged in a variety of unfair labor practices ("ULPs"), including the illegal discharge of employees who had vocally supported the union. In early November 1991, an administrative law judge held hearings on the various ULPs and found that Goldtex had indeed violated several provisions of the Act. The Board's order affirming those findings has been summarily enforced by this court.

While the election-related ULPs were being litigated, Goldtex's business experienced significant changes. In 1990 and early 1991, the company responded to increasing business by expanding from a three-shift, six-day work week to a four-shift, seven-day continuous operation. In August 1991, however, the boom came to a halt upon Goldtex's loss of a major customer for fabrics produced in the plant. As a result of this business downturn, layoffs became inevitable.

During this downturn, Goldtex decided to reevaluate its termination policy. Instead of basing layoffs on seniority, as had been done in the past and as was specified in the company's recently adopted employee handbook, Goldtex chose to focus on employee performance. To aid in making discharge decisions, counsel for Goldtex drafted a performance evaluation form to be completed for each employee. Although the form was used for later layoffs in December 1991 and January 1992, it was not available for the November layoffs challenged here. The November 1991 layoffs resulted in the permanent discharge of print finishing department employees Bobby Richardson, Bobby Rutter, James Reid, and Melvin Wright, along with employees from other departments at the plant.

The discharge of these four print finishing department employees led to charges that the company had violated §§ 8(a)(1) and 8(a)(3) of the NLRA. The ALJ found such violations had occurred. The ALJ relied primarily on the timing of the layoffs immediately following the November ULP hearings, although he made no findings that the employees whose discharges are at issue here were in any way involved in those proceedings. The ALJ also relied on Goldtex's decision to base the layoffs on employee performance rather than relying on seniority as it had in the past. The ALJ noted that discharged employee Richardson, who was one of the most active supporters of the Union during the representation campaign, was the most senior member of the print finishing department at the time of the layoffs. The ALJ similarly noted that discharged employee Rutter was the second most senior employee in the department, and chose to credit Rutter's testimony that he had revealed his

pro-union stance to a supervisor during the 1990 election campaign. Regarding employees Reid and Wright, the ALJ made no findings as to their support for, or opposition to, unionization. The ALJ also relied on the fact that in September 1991, Goldtex elected to delay layoffs until January 1992, but then later conducted layoffs in November, December, and January. The November 1991 layoffs affected nine employees out of some 300 total employees. Although the ALJ questioned the timing of the November layoffs and the company's shift to job performance warnings and ability to operate different machines as a basis for its discharge decisions, he did not dispute the fact that economic circumstances necessitated layoffs at the company.

The Board affirmed the ALJ's decision and order, and Goldtex has petitioned this court for review. The Board has submitted a cross-application for enforcement of its order.

## II.

■ Section 8(a)(3) of the National Labor Relations Act states that "[i]t shall be an unfair labor practice for an employer … by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). Generally, an employer violates § 8(a)(3) only if its actions are motivated by anti-union animus. *See, e.g., NLRB v. Instrument Corp. of Am.,* 714 F.2d 324, 327 (4th Cir.1983); *NLRB v. Kiawah Island Co., Ltd.,* 650 F.2d 485, 490 (4th Cir.1981). Unwise and even unfair decisions to discharge employees do not constitute unfair labor practices unless they are carried out with the intent of discouraging participation in union activities. Accordingly, determining whether the employer's actions were motivated by anti-union animus is necessarily the crucial first step in a § 8(a)(3) case. *See NLRB v. Nueva Eng'g, Inc.,* 761 F.2d 961, 967 (4th Cir.1985).

■ In this case, the Board has failed to demonstrate the most basic element of an unlawful discharge—namely, that the employer was even aware of the discharged employees' protected activities. *See ARA Leisure Servs., Inc. v. NLRB,* 782 F.2d 456, 462 (4th Cir.1986); *NLRB v. Daniel Constr. Co.,* 731 F.2d 191, 197 (4th Cir.1984). As the Board has stated, "[c]ompany knowledge of union activities is the 'threshold question' where a violation of Section 8(a)(3) of the Act is alleged, because it is a 'fundamental prerequisite' in establishing a discriminatory motivation." *Mack's Supermkts., Inc.,* 288 N.L.R.B. 1082, 1101 (1988) (adopting an ALJ's decision and order). The burden does not shift to the employer to show that its action would have been taken in the absence of a discriminatory motive unless some *prima facie* case of such a motive has been made. *See Wright Line,* 251 N.L.R.B. 1083 (1980), *enforced,* 662 F.2d 899 (1st Cir.1981); *see also Instrument Corp. of Am.,* 714 F.2d at 327. It is on the question of motive, and its essential prerequisite of knowledge, that the Board's position founders.

■ Here, for example, the Board has plainly failed to show employer knowledge of protected activities with respect to two of the employees: Reid and Wright. The Board has offered no evidence of their support for, or even opposition to, the union. As a result, it is simply impossible to conclude that Goldtex discharged employees Reid and Wright to discourage union activities. As far as Goldtex's managers knew, Reid and Wright may have opposed the union.

■ With respect to employee Rutter, the Board's position presents a closer call. Nonetheless, there is little to show that Goldtex was aware of Rutter's "private" support for the Union. The only evidence suggesting that Goldtex knew of Rutter's pro-union position was Rutter's testimony that he disclosed his views to a supervisor in early 1990. It is difficult to imagine, however, that Goldtex would seize upon that statement nearly two years later to lay off an employee who was never close to vocal in his support for unionization. Furthermore, as with employees Reid and Wright, the Board makes no showing that Rutter in any way participated in the November 1991 ULP hearings. Accordingly, the Board has failed to show that

Rutter's discharge was discriminatorily motivated.

■ The Board contends that the discharged employees compared favorably to the retained employees both in terms of their disciplinary records and in terms of their value to the company by virtue of their versatility in operating different pieces of machinery. The Board argues, for example, that Rutter could operate the "Arioli" steamer, as well as two other machines in the print finishing department, and that less senior employees who were retained had, like Rutter, received performance warnings for running defective cloth. The Board similarly claims that the company considered stale performance warnings, issued more than a year before discharge, when laying off employee Reid. Goldtex responds in kind, explaining that retained employees could operate more equipment in the department, including the especially complex Marshall Williams Frame, a machine which none of the discharged employees could operate. This argumentation is simply premature. Evidence of pretext, if such it be, does not even enter the picture until some evidence of a discriminatory discharge has been brought forward. *See ARA Leisure Servs.,* 782 F.2d at 462; *see also NLRB v. Transp. Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (upholding the Board's *Wright Line* allocation of burdens). Where, as here, there is no evidence that the company discharged particular employees in order to discourage union membership or activities, the company is entitled to its own assessment of an employee's worth, an assessment which must be respected by the Board. Such is the case with the discharges of employees Reid, Wright, and Rutter.

■ Employee Richardson's discharge presents quite a different case. Unlike the other three employees, Richardson was a vocal union activist whose views were well-known both to the supervisors and to the managers at Goldtex. Indeed, the company excluded him from employee meetings during the 1990 union representation campaign. This evidence is sufficient to make out a *prima facie* case of unlawful discharge, and the Board's conclusion that Goldtex failed to rebut that case is plainly supported by substantial evidence on the record as a whole. The Board was presented with evidence that Richardson was the most senior employee in the department and that his immediate supervisor believed the discharge to be a "big mistake." This evidence supports the Board's conclusion that Richardson was discharged because of his protected activities, rather than on the basis of poor job performance. The Board's order with respect to Richardson must therefore be enforced, since our review of the Board's decision is limited to ascertaining whether its findings are substantially supported by the record. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Daniel Constr. Co.,* 731 F.2d at 193.

■ Contrary to the Board's contention, however, finding a § 8(a)(3) violation with respect to Richardson does not justify the Board's decisions regarding Reid, Wright, and Rutter.[1] We cannot just assume that Goldtex acted with improper motivation as to all discharged employees because it did so with respect to one of them. Where, as here, layoffs were necessitated by economic circumstances, the impermissible discharge of one pro-union employee does not automatically infect all discharges made during that same month. Rather, it is incumbent on the Board to show what the statute mandates: that the employees were discharged for the purpose of discouraging union activities. Otherwise, companies such as Goldtex would lose the flexibility to control the size of their work force when adverse economic conditions required a reduction in personnel.

The Board has relied on cases from other circuits to support its assertion that it need not show that all the discharged employees here were involved in protected activities. *See, e.g., Hyatt Corp. v. NLRB,* 939 F.2d 361 (6th Cir.1991); *Ballou Brick Co. v. NLRB,*

---

1. Likewise, the Board spends much time discussing the discharge and ardent union support of employee Johnny Gervin. Again, however, Gervin's vocal support for unionization contrasts markedly with the absence of such evidence with respect to three of the four employees whose terminations are at issue here.

798 F.2d 339 (8th Cir.1986). These cases fail to bolster the Board's argument, however, because they do not concern layoffs which were economically necessary. Substantial evidence in those cases supported the conclusion that all of the layoffs were motivated by the employers' desire to discourage union activities or membership. *See Hyatt Corp.,* 939 F.2d at 375–76; *Ballou Brick Co.,* 798 F.2d at 342. Our own holding in *NLRB v. Frigid Storage, Inc.,* 934 F.2d 506 (4th ·Cir. 1991), is distinguishable on the same grounds: there was no valid economic reason for layoffs in that case, *see id.* at 510. It is not disputed that layoffs in this case were required because of a downturn in Goldtex's business fortunes, specifically the loss of a major customer and a general decline in business orders during and after August of 1991. Where layoffs are economically justified, the invalidation of a single impermissible discharge will not serve to similarly invalidate all contemporaneous terminations.[2]

### III.

 Were we to uphold the Board's decision in its entirety, the legitimate business judgments of companies such as Goldtex would be substantially constrained. As the Seventh Circuit has aptly stated, "[t]he ALJ and board are not business managers who decide what is best for business.... Congress has left to management the decision[ ] of whether a reduction in the number of employees is necessary...." *Midwest Stock Exch., Inc. v. NLRB,* 635 F.2d 1255 (7th Cir.1980); *see also Merchants Truck Line, Inc. v. NLRB,* 577 F.2d 1011, 1014 (5th Cir. 1978) ("Discharge is a traditional management prerogative; lack of justification is not to be lightly inferred.").· Moreover, the central management role of hiring and firing employees takes on additional importance when a company is experiencing economic troubles. As a result, this court has carefully limited the Board's interference with discharge decisions, explaining that an employer is free to dismiss an employee for " 'good cause, no cause, or for any reason [it] chooses

except the employee's union activity.' " *ARA Leisure Servs.,* 782 F.2d at 462 (quoting *Torrington Co. v. NLRB,* 506 F.2d 1042, 1047 (4th Cir.1974)). Even where a *prima facie* case of discriminatory discharge has been presented, the employer must be given the opportunity to rebut that case by presenting a valid business justification. *Nueva Eng'g,* 761 F.2d·at 967.

. In this case, there can be little question that layoffs at Goldtex were economically justified; the Board's General Counsel did not dispute 'the need for a work force reduction in the late fall and early winter of 1991–92. The November 1991 layoffs followed a substantial decline in business in all of Goldtex's ·departments. In August 1991, for example, a customer accounting for nearly 40% of all fabric orders from the plant's dyehouse discontinued its business with Goldtex. The print side of the plant encountered similar problems, and beginning in September 1991, employees in all ·print-related departments began working reduced hours. In the print finishing department, where the four discharged employees were located, the shortage of available work forced Goldtex to shift employees to other departments and to reduce equipment operation hours. The November 1991 layoffs were merely part of a larger effort to achieve needed work force reductions—an effort aided by 26 discharges in December 1991 and 16 discharges in January 1992. In all, approximately 25% of Goldtex employees, including salaried personnel, were discharged during the period from November 1991 to January 1992. There could hardly be a stronger showing of economic need for layoffs.

 Despite the special attention required when the economic justification for layoffs is apparent, 'however, the ALJ gave little weight to the business climate in which Goldtex was functioning. Instead, the ALJ concentrated on the timing of the layoffs after the November ULP hearings, finding that this timing was indicative of discriminatory motivation. The ALJ was certainly free

---

**2.** Cases relied upon by the Board discuss "mass" or "general" layoffs, *see Hyatt Corp.,* 939 F.2d at 375; *Ballou Brick Co.,* 798 F.2d at 342, when undertaken for the punitive purpose of discour-

aging union membership or activity. In the instant case, the November layoffs encompassed nine employees out of some 300 total, and no similar punitive purpose has been shown.

to consider the timing of the layoffs as evidence of anti-union animus, *see NLRB v. Rain–Ware, Inc.,* 732 F.2d 1349, 1354 (7th Cir.1984), but such timing cannot be given conclusive effect. This is especially so because the Board's timing argument in this case is weakened by its failure to show that employees Reid, Wright, and Rutter were in any way involved in the November 1991 hearings. If layoffs such as these, which were conducted shortly after ULP hearings but were not shown to have any other connection to those hearings, were always prohibited, an employer would lose the ability to make decisions crucial to business operations whenever ULP hearings were held. The result would be some arbitrary time period after such hearings during which employers could not take any action capable of being construed as discouraging union activity, regardless of the employers' true motivation for that action. The creation of such a broad "no discharge" period ignores a fundamental tenet of the NLRA: anti-union animus must be shown before particular discharges can be invalidated.

 Much the same point can be made with respect to the second factor relied upon by the ALJ to justify a § 8(a)(3) violation here, namely the shift to a performance-based termination policy. A company's adoption of a performance-based, rather than a seniority-based, criterion for termination is unlawful only if it operates as a pretext for discouraging union membership or dismissing employees who were active in their support for unionization. Otherwise, it is a perfectly legitimate attempt on the part of a company to shore up the performance of its work force in a time of economic stringency. Whether a shift to discharges on the basis of performance contravenes other federal statutes or state law is not for us to determine. We hold only that it may not be said here to contravene § 8(a)(3) of the NLRA.

## IV.

Section 8(a)(3) of the Act ensures that no employee may be discharged because of participation in union activities. The section plays an important role in the Act's protection of collective bargaining and employee participation in labor organizations. But § 8(a)(3) is not broad enough to protect all discharged employees; rather, it protects only those whose termination stemmed from their employer's anti-union animus. The Board's conclusion that employee Richardson was discharged because of such animus on the part of Goldtex is sufficiently supported by the evidence to be enforced. However, because the Board did not have sufficient evidence to reach a similar conclusion with respect to employees Reid, Wright, and Rutter, the portion of its order concerning those three employees cannot stand.

For the foregoing reasons, enforcement of the order of the National Labor Relations Board is granted in part and denied in part.

*ENFORCEMENT GRANTED IN PART AND DENIED IN PART.*