**POWER INCORPORATED, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**United Mine Workers of America, International Union, Intervenor.**

No. 93–1383.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 7, 1994.

Decided Nov. 18, 1994.

Rehearing and Suggestion for Rehearing In Banc Denied Jan. 6, 1995.

Frederick J. Bosch, Philadelphia, PA, argued the cause for petitioner. With him on the briefs was Herbert G. Keene, Jr., Philadelphia, PA.

David A. Fleischer, Attorney, N.L.R.B., Washington, DC, argued the cause for respondent. With him on the brief were Linda Sher, Acting Associate Gen. Counsel, and Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, DC.

Barry A. Woodbrey, Jr. and William B. Manion, Washington, DC, filed the brief for intervenor United Mine Workers of America.

Before WALD, SILBERMAN and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Opinion concurring in part and dissenting in part filed by Circuit Judge HENDERSON.

WALD, Circuit Judge:

Power, Inc. ("Power") petitions for review of an order of the National Labor Relations Board ("NLRB" or "Board") dated May 28, 1993. The Board found that Power violated § 8(a)(1) of the National Labor Relations Act ("NLRA" or "Act") by unlawfully threatening employees with plant closure, job loss, and other reprisals if they unionized; that it violated §§ 8(a)(1) and 8(a)(3) by laying off thirteen union supporters and refusing to rehire another former employee; and that it violated § 8(a)(5) by failing to bargain with the United Mine Workers of America ("UMWA") over two subcontracting decisions.[1] Power also challenges remedial orders issued by the Board retroactively requiring the company to bargain with the UMWA, and requiring the company to resume subcontracted drilling operations.

The NLRB cross-applies for enforcement of its order, and the UMWA intervenes on the side of the Board. We deny Power's petition for review, and enforce the Board's order.

### I. BACKGROUND

Power, Inc. operates a surface coal mine (strip mine) in central Pennsylvania. Power operated at a loss from 1978 until 1987 while under the ownership of Derek Crouch, plc ("Crouch"), a British corporation. In August, 1987, Ryan International ("Ryan"), another British corporation, bought Crouch (including its subsidiary, Power), and immediately began to reassess Power's mining strategy. In March, 1988, Ryan named Dan Armstrong, an official of Crouch Mining, Ltd.,[2] as President of Power. Armstrong reduced Power's workforce by 41 percent (63 employees) in 1988 through six rounds of permanent layoffs, combined with retirements and attrition. Despite this cost-cutting, Power reported a net operating loss of $2.7 million in 1988, as a result of weak coal prices and production shortfalls. Power's workforce reduction strategy involved laying off workers by seniority within job classifications, without regard to overall length of service with the company. This, combined

---

1. Section 8(a)(1) of the Act makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of [their] rights" to unionize. 29 U.S.C. § 158(a)(1). Section 8(a)(3) makes it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). Section 8(a)(5) makes it an unfair labor practice for an employer to "refuse to bargain collectively with the representative of his employees." 29 U.S.C. § 158(a)(5).

2. Crouch Mining, Ltd. had been a subsidiary of Derek Crouch, plc. In 1987, Ryan sold off Derek Crouch's nonmining units and operated Crouch Mining and Power as separate subsidiaries of Ryan.

with the prospect of further layoffs, contributed to unrest among Power's employees.

In December, 1988, a management group at Ryan formed a new company, Digger, plc ("Digger"), and announced plans for a leveraged buyout of Ryan at a cost of more than $100 million. On December 13, 1988, shortly after the announcement of the leveraged buyout, Power employees John Acey, Jr., Mike Acey, and Elmer Laird contacted the UMWA, and subsequently began circulating union authorization cards.

In December 1988 and the early months of 1989, various company officials, including the production equipment manager, a supervisor, and the general foreman, warned employees that if the company was unionized, it would be shut down. Joint Appendix ("J.A.") 8–10, 142–43, 316–17, 456–57, 484–85, 588, 636. Around this same time, Power's Treasurer Derek Reed, the company's second-ranking official, told office manager Theresa Cantolina that employees John Acey, Sr. and his sons John Acey, Jr. and Mike Acey were "troublemakers" who had brought on the union activity. J.A. 352–53. In another conversation with the same office manager, Reed said that the company would get rid of the union supporters. Id. In July 1989, Les Nicholson, Managing Director of Crouch Mining, told Cantolina that the parent corporation would put Power out of business before allowing a union. J.A. 356.

On January 3, 1989, Power temporarily suspended all mining operations after a breakdown in its coal processing facilities. Power ultimately reported an operating loss of $1 million for the first quarter of 1989.

On January 6, 1989, having collected the signatures of a majority of Power's production and maintenance workers, the UMWA demanded recognition as collective bargaining representative, and filed a petition for a certification election.

On January 25, 1989, Power President Dan Armstrong finalized a report ("January 25 Report") recommending conversion of Power's cast blasting and dragline mining method to a shovel and truck mining method, requiring changes in Power's equipment and workforce. Armstrong projected layoffs of 23 additional employees.

On February 24, 1989, the NLRB's regional director ordered a union representation election to be held on March 23.

On March 10, 1989, Power laid off thirteen employees; these layoffs were the basis for unfair labor practice charges subsequently upheld by the NLRB. Laid off were one driller, two dragline oilers, two dragline operators, two loader operators, three dozer operators, and three rock truck operators. These layoffs were all in categories slated for elimination or reduction in Armstrong's January 25 Report, although layoffs were not uniformly made in all job classifications identified for reduction in that report. *Compare* January 25 Report, J.A. 1468 (projected layoffs, by category) *with* J.A. 14 (actual layoffs, by category). The layoffs also generally followed Power's prior policy of letting go workers by seniority within a given job classification rather than on the basis of seniority with the company. Nonetheless at least one employee who had not signed a union card was anomalously transferred to another job category just before the layoffs, thus effectively insulating him from layoff. J.A. 846, 932, 1078. In addition, some maintenance workers were transferred to 100–ton rock truck operations, even though 35–to–50–ton rock truck operators, some with greater overall seniority within the company, were being laid off. J.A. 638–39, 683, 879, 882, 885. Although Power claimed placing maintenance workers in truck operator positions would allow these workers to do maintenance on their own trucks, they were never called upon to do maintenance work. J.A. 649–53, 683. All thirteen laid-off workers had signed union authorization cards. J.A. 1265–75, 1291, 1295, 1303, 1307. Most had worn or displayed union insignia at work, J.A. 149, 197, 313–14, 446, 485, 499–500, 561, 587, and many had engaged in visible activities on behalf of the union within sight of management personnel, J.A. 150–51, 313–14, 456, 485, 499–500, 1262–63. Eight were members of a twelve-person "in-house organizing committee" established by the union. J.A. 194. Two (John Acey, Jr. and Elmer Laird) were among the three who had initially contacted

the UMWA. And two (John Acey, Sr. and John Acey, Jr.) were among the three identified as pro-union "troublemakers" by Treasurer Reed. Three days after these layoffs, Armstrong returned to Great Britain to take over management of a larger mine.

On March 21, 1989, Supervisor Pete Prohaska told four employees that if the union came to Power, the thirteen employees laid off on March 10 would return and take the jobs of employees who were still working. J.A. 103–04. On that same date, Chris Hotson, Chairman of Power's parent corporation, Ryan International, held meetings with employees on two shifts, saying that he expected them to vote "no" in the upcoming union election; that the thirteen employees laid off on March 10 were trying to cause a strike and were "past history"; that in the past he had shut down a mine when he was unable to reach an agreement with the union; and that any union would eventually put a company out of business. J.A. 102–03, 116, 625.

A union representation election was held on March 23, 1989. The result was 27 votes for the union, 30 against, and 19 challenged ballots. Thirteen of the 19 challenged ballots were cast by the employees laid off on March 10; the Board subsequently ordered these 13 ballots to be counted, resulting in 40 votes for the union and 30 against. However, because of the time lag in NLRB proceedings, the union was not certified until July 1, 1993, more than four years after the election.

In April, 1989, a contingent of experienced Crouch Mining employees arrived from Great Britain and proceeded to operate rock trucks, dozers, a large shovel imported from Britain as part of the restructuring plan, and other heavy equipment. This work included operation of heavy equipment previously operated by some of the employees laid off on March 10. J.A. 642, 655–61, 682–84, 696–700, 704–05, 991–94, 998–1000, 1003–09, 1024–27, 1046–49, 1194–98, 1336–66.

In September 1989, Frederick Bosch, an attorney for Power, met with several small groups of employees and threatened that the company would replace striking workers in the event of a strike, and that anyone "caught helping" the thirteen laid-off workers by contributing to a union-sponsored hardship fund would "be out there looking for help from somebody else." J.A. 608–10. On another occasion, Bosch told employees that Power would "drag on" NLRB proceedings. J.A. 687–88.

In December, 1989, without consulting the union, Power subcontracted the operating of its rock trucks, graders, and dozers to Operators Unlimited, Inc. ("Operators"), resulting in the layoff of bargaining unit workers who had been performing those functions. Separately, Power also subcontracted out its drilling work.

In March and October 1989, the UMWA filed a series of unfair labor practice charges against Power concerning its pre-election conduct, alleging violations of §§ 8(a)(1), (3), and (5) of the Act. These charges were ultimately consolidated for trial before an administrative law judge ("Power I"). In December 1989 and at various points in 1990 and 1991, the UMWA filed additional unfair labor practice charges concerning Power's post-election conduct, alleging violations of §§ 8(a)(1), (3), (4), and (5) of the Act. These were also consolidated for trial before the same Administrative Law Judge ("ALJ") ("Power II").

On May 6, 1992, the ALJ found that Power had violated § 8(a)(1) by unlawfully threatening employees with plant closure and other reprisals if they voted for the union or exercised statutory rights; these violations are uncontested. The ALJ further found that Power had violated §§ 8(a)(1) and (3) by permanently laying off thirteen employees for activities on behalf of the UMWA prior to the election and by refusing to rehire an experienced former employee, Robert Dillen, because of his union activities. As a remedy for unfair labor practices that, in his view, made a fair election impossible, the ALJ ordered Power to bargain with the UMWA, retroactive to January 6, 1989. The ALJ also found that Power had violated §§ 8(a)(1) and (5) by unilaterally, without bargaining with the UMWA, subcontracting rock truck, grader, and drilling operations, resulting in the layoff of bargaining unit employees. Power filed timely exceptions with the Board. On May 28, 1993, the Board adopted all of

the ALJ's findings of fact and conclusions of law, as well as his proposed order with minor modifications. 311 N.L.R.B. 599, J.A. 95. Power petitioned for review, the Board cross-applied for enforcement of its order, and the UMWA intervened on the side of the Board.

## II. ANALYSIS

This petition presents six questions: (1) Was the NLRB's finding that the permanent layoffs of March 10, 1989, violated §§ 8(a)(1) and 8(a)(3) of the NLRA supported by substantial evidence in the record? (2) Was the NLRB's finding that Power's refusal to re-hire Robert Dillen violated § 8(a)(3) supported by substantial evidence in the record? (3) Did the NLRB abuse its discretion by excluding clerical employees, the safety director, and two engineers from a bargaining unit otherwise consisting solely of production and maintenance employees? (4) Did the NLRB abuse its discretion by issuing a bargaining order as a remedy for pre-election unfair labor practices that the NLRB determined had made a fair election impossible? (5) Was the NLRB's finding that Power violated the retroactive bargaining order by unilaterally subcontracting bargaining unit work and laying off bargaining unit employees supported by substantial evidence in the record? (6) Did the NLRB abuse its discretion by ordering Power to resume unlawfully subcontracted drilling operations?

### A. *The March 10, 1989 Layoffs*

██ Employees of an employer covered by the National Labor Relations Act have the right to form, join, or assist labor organizations. NLRA § 7, 29 U.S.C. § 157. An employer violates §§ 8(a)(1) and (3) of the Act, 29 U.S.C. §§ 158(a)(1) and (3), if it discharges, lays off, or refuses to hire or rehire an employee because of that employee's union activity,[3] but "employers retain the right to discharge workers for any number of other reasons unrelated to the employee's union

activities." *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 394, 103 S.Ct. 2469, 2470, 76 L.Ed.2d 667 (1983). Thus "if the employer fires an employee for having engaged in union activities and has no other basis for the discharge, or if the reasons that he proffers are pretextual, the employer commits an unfair labor practice," *id.* at 398, 103 S.Ct. at 2472, but the employer can avoid being held in violation by offering "proof that the discharge would have occurred in any event and for valid reasons," *id.* at 400, 103 S.Ct. at 2473.

██ A layoff is unlawful if either the decision to lay off employees or the selection of those to be laid off is based on anti-union animus. *Davis Supermarkets, Inc. v. NLRB,* 2 F.3d 1162, 1168–69 (D.C.Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1368, 128 L.Ed.2d 45 (1994). Here, the NLRB found the layoffs of thirteen employees on March 10, 1989, were unlawful on both grounds. The NLRB's findings must be upheld if supported by substantial evidence on the record considered as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951). The record in this case supports the Board's findings.

██ To establish that a layoff was based on anti-union animus, the general counsel must first establish a *prima facie* case of unlawful discrimination by showing that the employee's union membership or activity was a "motivating factor" in the layoff; the burden then shifts to the employer to show that it would have taken the same action even in the absence of the protected union activity. *NLRB v. Wright Line,* 251 N.L.R.B. 1083 (1980), *enforced,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982); *Transportation Management Corp.,* 462 U.S. at 399, 103 S.Ct. at 2473.

---

3. Section 8(a)(1) makes it an unfair labor practice for an employer to "interfere with" or "coerce" employees in the exercise of their rights to unionize. Section 8(a)(3) makes it an unfair labor practice to "discriminate" in hiring, discharge, or terms and conditions of employment so as to encourage or discourage union member-

ship. Thus, if an employer discharges, lays off, or refuses to hire an employee because of that employee's union activity, the employer both "interferes with" and "coerces" employees in the exercise of their rights in violation of § 8(a)(1), and "discriminates" so as to discourage union membership in violation of § 8(a)(3).

■ Motive is a question of fact, and the NLRB may rely on both direct and circumstantial evidence to establish an employer's motive, considering such factors as the employer's knowledge of the employee's union activities, the employer's hostility toward the union, and the timing of the employer's action. *Teamsters Local Union No. 171 v. NLRB*, 863 F.2d 946, 955 (D.C.Cir.1988), *cert. denied*, 490 U.S. 1065, 109 S.Ct. 2063, 104 L.Ed.2d 628 (1989).

■ Here, the Board found that the company was openly hostile toward the union, as manifested by statements of management personnel all the way up to the level of Chairman of the parent company, Ryan International, including uncontested § 8(a)(1) violations stemming from management officials' threats to close the mine if the union came in. J.A. 8–11. This is sufficient to establish a *prima facie* case of anti-union motivation. *Teamsters Local No. 171*, 863 F.2d at 956. In finding anti-union animus, the Board relied upon anti-union statements by Ryan Chairman Chris Hotson and Power Treasurer Derek Reed, J.A. 10–11, 13–15, as evidenced in part by testimony of office manager Theresa Cantolina which the Board, approving the ALJ's findings, found credible. J.A. 10. "The Court must uphold Board-approved credibility determinations of an ALJ unless they are 'hopelessly incredible' or 'self-contradictory.'" *Elastic Stop Nut Div. of Harvard Industries v. NLRB*, 921 F.2d 1275, 1281 (D.C.Cir.1990) (quoting *Conair Corp. v. NLRB*, 721 F.2d 1355, 1368 (D.C.Cir.1983)). Power President Dan Armstrong testified that the decision to lay off thirteen employees was a "group decision" in which Ryan Chairman Hotson participated. J.A. 871. Power Treasurer Reed testified that Hotson "directed" Armstrong to make the layoffs. J.A. 1146. Armstrong further testified that Reed participated in the layoff decision, J.A. 871, which Reed himself admitted, J.A. 1128–29. Because both Hotson and Reed participated in the layoff decision, the Board was entitled to rely on their anti-union statements as evidence of anti-union motivation, even though Reed's statements, made in private conversations to Theresa Cantolina, were not themselves unlawful.

Circumstantial evidence lends further weight to the NLRB's finding that the March 10 layoffs were motivated by anti-union animus. These layoffs disproportionately included union supporters and activists. J.A. 194, 1806–09. Every one of the laid-off workers had signed a union card, and eight of the thirteen laid-off workers were members of the union's twelve-person organizing committee.[4] J.A. 13. Most had worn union insignia or engaged in visible pro-union activity in the weeks immediately preceding the layoff. J.A. 13. The timing of the layoff, just two weeks before the scheduled union election, gives further credence to the charge of anti-union animus. J.A. 13–14. *Cf. Davis Supermarkets*, 2 F.3d at 1168 (timing and disproportionate targeting of union supporters for layoffs is circumstantial evidence of anti-union animus). By disenfranchising those thirteen workers the company would have effectively tipped the balance against the union, and may have discouraged other workers from taking up the union cause or voting for the union. The union ultimately won 40–to–30 with these thirteen votes, but would have lost 30–to–27 without them. *Cf. NLRB v. Ship Shape Maintenance Co., Inc.*, 474 F.2d 434, 440 (D.C.Cir.1972); *ARA Leisure Services, Inc. v. NLRB*, 782 F.2d 456, 462–63 (4th Cir.1986) (discharge of pro-union employees shortly before election would shift voting balance and may deter other employees from voting for union; this is circumstantial evidence of anti-union animus).

■ Power responds that these layoffs stemmed not from anti-union animus but from economic necessity, contending that they were part of a much larger pattern of layoffs and made under a consistent policy of laying off workers by seniority within job classifications. The evidence showed, however, that Power found it necessary to import British workers less than a month after the layoffs, in part to work on equipment previously operated by those laid-off union supporters. J.A. 15–16. Many of the laid-off workers had worked on graders, dozers, loaders, and rock trucks; the British workers

---

**4.** Another member of the organizing committee, Mike Acey, had already been discharged.

operated this identical equipment, and in addition operated a new piece of equipment, an O & K Shovel. J.A. 15–16. Power also found it necessary to require the remaining American production workers to work large amounts of overtime to keep production up to satisfactory levels after the layoffs [5]—beginning in May, day-shift employees worked 12–hour days on weekdays and 6 hours on Saturday. J.A. 1032–33. The Board reasonably concluded that these post-layoff manpower requirements undercut the company's "economic necessity" argument. And even if it were true, as Power argues, that the decision to lay off thirteen workers was simply one in a long series of layoffs necessitated by economic conditions and the company's restructuring plan, the Board found that job classifications and seniority were applied nonuniformly to the advantage of nonunion workers and to the disadvantage of union activists. J.A. 15–16. Maintenance workers were reassigned to operate 100–ton rock trucks, while union activists with experience operating 35– to 50–ton rock trucks were laid off.[6] J.A. 15. One dozer operator who had not signed a union card was reassigned to another job category in a move Power President Armstrong acknowledged was made specifically to insulate him from layoff, J.A. 846–47, 932–33, even though Armstrong knew that a more senior dozer operator, union activist Elmer Laird, had just a few weeks earlier indicated his willingness to accept that reassignment. J.A. 15, 932. Laird's seniority was then recalculated to remove credit for time spent operating a dozer in the tipple, thus subjecting him to layoff, J.A. 15; he was the only dozer operator whose seniority was so recalculated, J.A. 1146, even though at least one other dozer operator had been similarly credited with seniority as a dozer operator for operating a dozer in the tipple. J.A. 927–31, 1148. While Power offers post-hoc explanations for each of these moves, the Board found the assertion that these were all neutral business-related decisions which just coincidentally fell to the disadvantage of union activists unconvincing. J.A. 15–16. We conclude from the record as a whole that the Board had a sufficient basis upon which to find that Power manipulated seniority and job classifications in order to lay off union activists.

In sum, the circumstantial evidence, combined with the statements of Power officials, establish a *prima facie* case of anti-union animus. Power in turn has not met its burden of showing that it would have decided to lay off these workers even in the absence of anti-union animus. Accordingly, we conclude that there is substantial evidence in the record taken as a whole to support the NLRB's finding that the March 10 layoffs were motivated by anti-union animus, in violation of §§ 8(a)(1) and (3).

## B. *Refusal to Rehire Robert Dillen*

There is also substantial evidence in the record to support the NLRB's finding that Power's refusal to rehire Robert Dillen was motivated by anti-union animus. Dillen was a maintenance worker transferred to 100–ton rock truck operations after the March 10 layoffs, and subsequently laid off

---

5. Power's own records indicate that its large losses in 1988 were due principally to production shortfalls. January 25, 1989 Report, J.A. 1461 ("heavy losses sustained in 1988 ... are mainly due to 30% shortfall from production targets").

6. Although Power contends these layoffs were part of a planned restructuring of its workforce, the decision to lay off 35–50 ton rock truck operators and instead use maintenance workers to operate the new 100–ton trucks does not square with the plan outlined by Power President Dan Armstrong in his January 25, 1989 report. There, he proposed laying off 6 of the 11 maintenance workers, and consolidating 35–50 ton truck operators, dozer operators, and grader operators into a single unit "in order to keep the most experienced alround [sic] operators to operate [dozers and graders] ... and be properly trained to operate the new 100 ton trucks." J.A. 1468. Power was, of course, entitled to revise its plan before the March 10 layoffs. But the Board could reasonably doubt the credibility of this explanation when the company in effect argues that it had one plan on January 25 calling for the most experienced equipment operators to operate 100–ton trucks; a thoroughly inconsistent plan on March 10 calling for maintenance workers rather than experienced equipment operators to operate the trucks so they could do their own maintenance; and yet a third plan, inconsistent with the first two, a few days after the layoffs, with the former maintenance workers now asked merely to operate but not to do maintenance on the 100–ton trucks.

when the company subcontracted rock truck operations in December, 1989. In the interim, Dillen continued to engage in union activity, much of it of a highly conspicuous nature, including wearing union insignia both before and after the election, J.A. 1814, and, on the union's behalf, photographing British workers operating equipment formerly operated by laid-off union supporters, J.A. 1816–17. Dillen also joined the union's in-house organizing committee, served on the grievance committee, and was elected Recording Secretary of the local union in August, 1989. J.A. 1814–15. He helped organize and actively participated in picketing after the rock truck operations were subcontracted. J.A. 1814–25. After being laid off, Dillen requested that he be reinstated in his old position as a maintenance mechanic, as several other (and less senior) former maintenance mechanics then working as 100–ton truck operators had been. He was told by Operations Manager John McBean, at the time the top on-site Power official, "Bob Dillen, we're through with you." J.A. 1819–20.

When the company later advertised a job opening for a maintenance mechanic—work of the type Dillen had originally been doing, apparently quite satisfactorily since his former supervisor "had nothing but good things to say" about his work, J.A. 2022—Dillen reapplied but was rejected in favor of two employees with no experience in the coal mining industry or in maintenance on heavy equipment. J.A. 2024, 2144–46, 2153–54. The company later offered the explanation that one of the employees hired in Dillen's stead had experience in electrical work and therefore gave the company more "flexibility," but the job advertisement did not mention electrical work,[7] Dillen was not asked about his qualifications to do electrical work, and Wash Plant Manager Jeff Andrews, one of the two Power officials making the hiring decision, testified that he did not know and did not ask whether Dillen had electrical experience, although he did know of Dillen's union activity. Under these circumstances, the Board could reasonably find that the decision not to rehire Dillen was based on

anti-union animus, and conclude that the company's post-hoc explanation of this decision was "pretextual," J.A. 30. *Cf. NLRB v. General Wood Preserving Co.*, 905 F.2d 803, 816–17 (4th Cir.), *cert. denied*, 498 U.S. 1016, 111 S.Ct. 590, 112 L.Ed.2d 595 (1990); *Great Lakes Chemical Corp. v. NLRB*, 967 F.2d 624, 629 (D.C.Cir.1992). We conclude therefore that there is substantial evidence in the record to support the NLRB's finding that Power's decision not to rehire Dillen was the result of anti-union animus.

## C. *Bargaining Unit*

Power contends that the NLRB erred in excluding seven employees—four clericals, a safety director, and two engineers—from the bargaining unit on the grounds that they had no "community of interest" with production and maintenance workers in the unit.

 The Board has broad discretion in determining an appropriate bargaining unit, but the determination must be supported by substantial evidence. *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 171, 92 S.Ct. 383, 393–94, 30 L.Ed.2d 341 (1971). In determining the appropriate bargaining unit, the "central test is whether the employees share a 'community of interest,' that is, 'substantial mutual interests in wages, hours and other conditions of employment,'" *Bentson Contracting Co. v. NLRB*, 941 F.2d 1262 (D.C.Cir.1991) (quoting *Allied Chemical Workers*, 404 U.S. at 172, 92 S.Ct. at 394). The Board takes into account such factors as the employees' skills, duties, and working conditions, the employer's organization and supervision, and bargaining history. *Airco, Inc.*, 273 N.L.R.B. 348 (1984).

██ Exclusion of office clericals from production units is consistent with longstanding NLRB policy, and has repeatedly been upheld. *See, e.g., NLRB v. Mar Salle, Inc.*, 425 F.2d 566, 569–70 (D.C.Cir.1970). The Board reasonably concluded that exclusion of clericals is appropriate here given evidence in the record that the clericals perform "rou-

---

7. The job was listed under the heading "Mechanic" and stated that the "[c]andidate should have demonstrated mechanical and welding skills."

J.A. 29. Dillen possessed these skills. J.A. 1827, 2023.

tine office functions," J.A. 18, 346–47, have little on-the-job contact with production workers, J.A. 344–48, engage in little or no production work, .J.A. 348–49, 366, 368, do not transfer into or out of production positions, J.A. 1667–68, are separately supervised, J.A. 344, and work under substantially different working conditions, including different hours, J.A. 350, and a different compensation and benefits scheme, J.A. 349–50.

■■■ The safety director and engineers also work separately from production and maintenance units, J.A. 729–30, 733, 760–62, in highly specialized and skilled nonproduction functions, J.A. 421–22, 728–29, 753–59, are salaried rather than paid by the hour, J.A. 422, 730–31, 754, and report directly to the highest on-site official, thus placing them outside the ordinary chain of supervision for production and maintenance employees, J.A. 731, 756. Power correctly notes that a distinction between salaried and hourly compensation, without more, is not dispositive, especially when the overall rates of pay are comparable. *Avon Products, Inc.*, 250 N.L.R.B. 1479 (1980). But what distinguishes these employees from production and maintenance workers is not the method of payment but the character of their work. The safety director is principally responsible for ensuring compliance with federal and state mine safety and environmental regulations, including training production workers in proper safety procedures and occasionally directing production workers in safety projects. The engineers are responsible for calculating how much coal has been mined, mapping and planning future mining operations, marking boundaries to ensure mining operations remain within the limits allowed by state permits, and reporting on all these matters to the top on-site official. While these functions may involve some ongoing contact with production workers, and undoubtedly are in some sense "integrated with Power's mining operations," Petitioner's Brief at 38, they are nonetheless highly specialized and distinctively nonproduction functions, and clearly fall outside the ordinary chain of supervision of production and maintenance work. Thus the Board could reasonably conclude, on the basis of substantial evidence in the record, that these employees had no "community of interest" with production and maintenance workers. Therefore we will not disturb its decision to exclude them from the bargaining unit.

### D. *Bargaining Order*

■■■ Power challenges the NLRB's decision to issue an order requiring the company to bargain with the union retroactively as a remedy for the company's §§ 8(a)(1) and (3) unfair labor practices. A bargaining order places the employer under an obligation to bargain with the union, and is usually made retroactive to the date when the employer first began to engage in unfair labor practices—in this case, January 6, 1989, the date Power received the union's request for recognition and, according to the NLRB, "the approximate date when [Power] embarked upon a clear course of unlawful conduct designed to undermine the Union's majority status." J.A. 31. A retroactive bargaining order thus conclusively establishes the union as the employees' bargaining representative, bypassing the normal process of a representation election.[8] Under longstanding NLRB practice, a bargaining order is accompanied by a decertification bar, under which the union's status as bargaining representative cannot be challenged through decertification procedures for a "reasonable period," usually a year; and if a collective bargaining agreement is reached during that period, the decertification bar would be extended another three years. *Sullivan Industries v. NLRB*, 957 F.2d 890, 903 & n. 5 (D.C.Cir.1992). A bargaining order is thus a more powerful, and from the employer's perspective more severe, remedy than others at the Board's disposal. Cease-and-desist orders, for example, operate only prospectively to prohibit future unfair labor practices. Other remedies available to the Board include ordering a new election, requiring the employer to post or to read aloud a notice advising employees of their rights, and or-

---

8. The employer may, of course, grant voluntary recognition to a union upon a showing of majority support through authorization cards, but is not required to do so and may insist on an election. *NLRB v. Creative Food Design Ltd.*, 852 F.2d 1295, 1297 (D.C.Cir.1988).

dering reinstatement of unlawfully discharged employees with backpay. None of these "lesser" remedies, however, relieve the union of the need to win a representation election. Moreover, since a bargaining order is typically made retroactive to the date of the employer's alleged violations (on the theory that retroactive application is needed to erase any benefit the employer might have acquired as a result of its unlawful activity), it can give rise to additional § 8(a)(5) charges of unlawful refusal to bargain from that date forward.

Power first argues that the bargaining order cannot stand because the company did not violate § 8(a)(3), but because we have upheld the NLRB's determination that the company violated §§ 8(a)(1) and (3), this argument falls. Power next argues that the NLRB "failed to provide a reasoned explanation for its decision to impose a bargaining order." Petitioner's Brief at 41.

■ The NLRB has broad discretion to fashion remedies to effectuate the purposes of the Act, and courts review those determinations deferentially. *St. Francis Fed. of Nurses & Health Pro. v. NLRB*, 729 F.2d 844, 849 (D.C.Cir.1984). We have emphasized, however, that because employees' freedom to choose whether to be represented by a union is "at the very center of our national labor relations policy," *Conair Corp. v. NLRB*, 721 F.2d 1355, 1377–78 (D.C.Cir. 1983), *cert. denied*, 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 819 (1984), a bargaining order is an extraordinary remedy when a union has not yet achieved representative status through recognition or a certified election. *See, e.g., Avecor, Inc. v. NLRB*, 931 F.2d 924, 934–35 (D.C.Cir.1991) ("The normal cure for an unfair election is a fair election, and the Board wields an array of remedies to enhance its likelihood."), *cert. denied*, — U.S. ——, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992), and cases cited therein.

■ The NLRB may issue a bargaining order as a remedy for pre-election unfair labor practices in either of two circumstances: (1) in "exceptional" cases involving "outrageous" and "pervasive" unfair labor practices of "such a nature that their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had" ("Category I cases"), or (2) in "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes" ("Category II cases"). *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 613–15, 89 S.Ct. 1918, 1939–41, 23 L.Ed.2d 547 (1969). In *Gissel* Category II cases, the NLRB must find that "the possibility of erasing the effects of past [unfair labor] practices and of ensuring a fair election ... by the use of traditional remedies ... is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order." *Id.* at 614–15, 89 S.Ct. at 1940. In *Gissel* itself, however, the Supreme Court upheld the Board's decision to issue a bargaining order in a Category I "pervasive and outrageous" case without elaborate findings of fact. *Gissel*, 395 U.S. at 615, 89 S.Ct. at 1940–41. Nor have our post-*Gissel* cases required more. In *Amazing Stores, Inc. v. NLRB*, 887 F.2d 328, 331 (D.C.Cir.1989) *cert. denied*, 494 U.S. 1029, 110 S.Ct. 1477, 108 L.Ed.2d 614 (1990), we said that in a Category I case, the NLRB need not make detailed findings of the type required for Category II cases, but instead must only make "minimal findings" of the lasting effect of unfair labor practices to support a bargaining order. *Accord, Davis Supermarkets*, 2 F.3d at 1171. Here, the NLRB has met that requirement.

■ Finding that Power's permanent layoffs of union supporters and activists, repeated statements to remaining workers that the thirteen laid-off workers would not be back, and persistent threats of plant closure in the event of unionization constituted a "severe" and "pervasive" pattern of coercive unfair labor practices, likely to recur, the NLRB determined that Power was a *Gissel* Category I case. J.A. 22, 96. *Cf. Gissel*, 395 U.S. at 615, 89 S.Ct. at 1940–41 (threats of plant closure alone were sufficient to place case in Category I). As the Board recognized, such egregious practices "str[ike] at the core of the employees' organizational efforts." J.A. 96. The NLRB, with its special expertise in these matters, is entitled to a

high degree of deference when it makes the threshold determination that a pattern of such egregious violations falls into Category I, and petitioner here does not dispute that categorization. The Board further found that, even with the passage of time, the "effects of [Power's] conduct ... cannot be eliminated by the application of traditional remedies" because of the extreme coercive and chilling nature of the violations; their frequency, persistence over a period of many months, and widespread dissemination throughout the workforce; and the likelihood that they would recur. J.A. 22. In particular, the Board found Power's repeated, numerous, and persistent threats of plant closure, which "reached, directly, nearly every employee in the bargaining unit," "among the most serious, flagrant and long-lasting forms of interference with employee rights," acting "to destroy employee support for a union and the possibility of a fair election." J.A. 22. The Board also concluded that it is "difficult to imagine any act of management better calculated to chill union support" than the layoffs of thirteen union supporters just days before the election. J.A. 22. For these reasons, the Board found that the violations involved "the type of severe and pervasive coercion that has lingering effects and that is not readily dispelled by time," so that "an election would not reliably reflect genuine, uncoerced employee sentiment." J.A. 96. The Board thus met the minimal fact-finding requirements set forth in *Amazing Stores*.

It is, of course, a fundamental principle of administrative law that agencies must give reasoned justifications for their actions. By making the threshold determination that a case falls into *Gissel* Category I, however, the NLRB makes a finding that the unfair labor practices are so egregious that "their coercive effects cannot be eliminated by the application of traditional remedies, with the result that a fair and reliable election cannot be had." *Gissel*, 395 U.S. at 614, 89 S.Ct. at 1940. When the unfair labor practices rise to that prominence, the only additional element needed to rationally support a bargaining order is a finding that the detrimental effects of the unfair practices will persist over time, so as to continue the need for the bargaining order even after

months or years have elapsed. Indeed, that is precisely what we require under *Amazing Stores*. In the context of such a finding, the logic of a remedial bargaining order becomes compelling: only a bargaining order can prevent the employer from reaping a lasting advantage from its own unlawful acts and assure employees their lawful right to organize. Because the NLRB has, by its *Gissel* Category I classification, determined that a fair election is impossible under lesser remedies, a bargaining order becomes the only appropriate substitute for an election, on the theory that except for the employer's malfeasance the union would have won a fair election and the employer would have been under an obligation to bargain with it. *Amazing Stores* thus does not take *Gissel* Category I cases outside the scope of basic administrative law; instead, the Board's categorization of a case as *Gissel* Category I itself provides most of the required "reasoned explanation." *Amazing Stores* found that as long as the minimal additional finding was made, the NLRB had complied with fundamental principles of "reasoned policy." *Amazing Stores*, 887 F.2d at 331.

Concededly, in the more typical *Gissel* case, a retroactive bargaining order is issued after the union has initially demonstrated majority support through authorization cards, then later *loses* the election because the employer's unfair labor practices have tipped the balance against it. The present case is unusual in that despite Power's unfair labor practices, the union ultimately *won* the election. Nonetheless, the underlying logic in favor of the bargaining order is the same. Here, at the time the bargaining order was issued in May 1993, the NLRB did not know which way the election would ultimately turn out, but it had already concluded that Power's unfair labor practices were so egregious as to make a fair election impossible—at a minimum, greatly increasing the union's burden and reducing its margin of victory, and possibly tipping the outcome against it. Moreover, by laying off thirteen workers and throwing the election results into confusion, Power gained a considerable delay in certification of the union until after the NLRB had resolved the union's unfair labor practice

charges, more than four years after the election. Without a bargaining order, Power would have accomplished a postponement of any duty to bargain long enough to allow it to subcontract portions of its work without even consulting the union. *See infra* Part III.E.[9] "Lesser remedies" would clearly be inadequate to cure that harm—a new election would only further delay bargaining, prospective cease-and-desist orders would not repair the harm already done, and reinstatement and back pay, while making whole those individuals laid off on March 10, 1989, would do nothing for those whose jobs were subsequently lost through Power's unilateral decision to subcontract their jobs. Finally, in these circumstances any remedy short of a retroactive bargaining order might "put a premium upon continued litigation by the employer," *St. Francis Federation of Nurses,* 729 F.2d at 856 (citation omitted), such that a "recalcitrant employer[ ] might be able by continued opposition to union membership indefinitely to postpone performance of [its] statutory obligation," *id.* at 857 (quoting *Franks Bros. Co. v. NLRB,* 321 U.S. 702, 705, 64 S.Ct. 817, 819, 88 L.Ed. 1020 (1944)). There is indeed evidence in this record (specifically, in statements by Power's attorney Frederick Bosch) that Power planned to drag its feet, challenging the union in NLRB proceedings and litigation every step of the way, in order to undercut the union's effectiveness. *See* J.A. 687. As the Board noted, "to withhold an otherwise necessary bargaining order in these circumstances would reward [Power] for its own wrongdoing." J.A. 96.

▮ In its contention that the Board has not adequately justified a bargaining order, Power relies principally upon cases requiring the NLRB to make more detailed findings of fact to support the issuance of remedial bargaining orders in *Gissel* Category II cases. *See, e.g., Avecor,* 931 F.2d at 937–39, and cases cited therein (in Category II cases, NLRB must give "reasoned justification" for bargaining order, including detailed factual findings and explanation why lesser remedies are inadequate). But *Gissel* Category II cases by definition involve less egregious

wrongdoing and lesser harm to workers' rights to organize, and it is precisely for those reasons that we require the NLRB to make detailed findings of fact and to weigh carefully its reasons for choosing a bargaining order over less extreme remedies.

Power also relies on our decisions requiring the NLRB to articulate reasons for issuing bargaining orders in contexts outside the *Gissel* framework, where a union is already recognized but the employer withdraws recognition or refuses to bargain. *See, e.g., Exxel/Atmos, Inc. v. NLRB,* 28 F.3d 1243, 1249 (D.C.Cir.1994) (NLRB must provide "clear explanation" of grounds for issuing bargaining order as remedy for employer's unlawful unilateral withdrawal of voluntary recognition); *Caterair International v. NLRB,* 22 F.3d 1114, 1123 (D.C.Cir.1994) (NLRB must explain why it issued bargaining order as remedy for employer's unlawful refusal to bargain with incumbent union); *Sullivan Industries v. NLRB,* 957 F.2d 890 (D.C.Cir.1992) (NLRB must explain why it issued bargaining order as remedy for successor employer's withdrawal of recognition of incumbent union); *Peoples Gas Sys., Inc. v. NLRB,* 629 F.2d 35 (D.C.Cir.1980) (NLRB must "clearly articulate" why it issued bargaining order as remedy for employer's unlawful withdrawal of recognition, when union was defeated in subsequent election). We have emphasized, however, that there may be crucial differences between these non-*Gissel* cases and the *Gissel* cases which require different balancing of competing interests, involving as they do nonincumbent unions seeking initial recognition in the one case and incumbent unions in the other. *See Caterair,* 22 F.3d at 1122–23.

The critical consideration here is that a *Gissel* Category I case is distinguishable from both *Gissel* Category II and non-*Gissel* cases. The Supreme Court has mandated a detailed balancing in *Gissel* Category II cases to ensure that in issuing a bargaining order the Board gives adequate consideration to employees' § 7 rights to freely choose

---

9. We assume, without deciding, that the subcontracting was a mandatory subject of bargaining, as the Board found, J.A. 95. Power has not challenged that finding by the Board in its petition for review. *See* Petitioner's Brief at 45; Respondent's Brief at 42 & n. 17.

whether to have a union. *Gissel*, 395 U.S. at 614–15, 89 S.Ct. at 1940–41. Our circuit has applied similar reasoning to make the same requirement in non-*Gissel* cases. *See, e.g., Caterair*, 22 F.3d at 1121–23. But in *Gissel* Category I cases, by contrast, employees' rights to freely choose have already been so thoroughly trampled by the employer's egregious unfair labor practices that it is no longer possible to fairly and accurately gauge what employees' uncoerced views would have been. Thus, in the *Gissel* Category I context, protection of employees' § 7 rights does not weigh so heavily as a countervailing value. It would be pointless to require the Board to explain in detail why it adopts a remedy that might in theory interfere with employees' rights to freely choose, when the Board has already concluded that the employer's own labor law violations have in fact made free choice by the employees impossible.

By determining that the unfair labor practices here were sufficiently egregious to make this a *Gissel* Category I case in which a fair election was impossible, and then making the necessary finding that the effects of the unfair labor practices would persist over time, the NLRB provided an adequate explanation to support its decision to issue a remedial bargaining order.

### E. *Unilateral Subcontracting*

■ Power next contends that the NLRB abused its discretion by finding that the company's unilateral decision to subcontract bargaining unit work violated § 8(a)(5) of the NLRA, which makes it an unfair labor practice for an employer to refuse to bargain with the employees' representative. Power challenges this determination solely on the ground that the retroactive bargaining order was improper. Petitioner's Brief at 45; Respondent's Brief at 42 & n. 16. Since the bargaining order was proper, Power was under an affirmative duty to bargain with the UMWA over all mandatory subjects of bargaining, which it breached by failing to bargain with the union.[10] The NLRB therefore

properly determined that Power's failure to bargain with the UMWA violated § 8(a)(5).

### F. *Order to Resume Subcontracted Drilling Work*

■ Power finally contends that the NLRB abused its discretion by ordering the company to resume work which it had unlawfully subcontracted. Power challenges the order only with respect to drilling operations, contending the remedy is "unduly burdensome" because it would require the company, having sold its drills, to buy new drills.

■ An order to resume unlawfully subcontracted operations seeks to "restor[e] the *status quo ante* to ensure meaningful bargaining." *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 216–17, 85 S.Ct. 398, 405–06, 13 L.Ed.2d 233 (1964). Once unlawful subcontracting is found, such an order is presumptively a valid remedy, and should be overturned only upon a showing by the employer that "compliance with the order is unduly economically burdensome" because resumption "would require a substantial outlay of new capital or otherwise cause undue financial hardship." *Teamsters Local No. 171 v. NLRB*, 863 F.2d 946, 957–58 (D.C.Cir.1988), *cert. denied*, 490 U.S. 1065, 109 S.Ct. 2063, 104 L.Ed.2d 628 (1989).

Power has not carried this burden. There is no showing on this record that Power cannot lease, rather than purchase, new drills. Nor does Power cite evidence of the cost of leasing or purchasing drills, or show that the cost, whatever it may be, would require a disproportionate capital outlay or cause undue financial hardship. In the absence of such a showing, we will not interfere with the NLRB's determination that a restoration of drilling operations was a necessary and appropriate remedy to restore the *status quo ante*.

### III. CONCLUSION

■ For the foregoing reasons, we enforce the Board's order in its entirety and

---

10. Once again, we assume without deciding that the subcontracting of this work was a mandatory subject of bargaining, as the Board found; Power does not contest this point here. *See supra*, note 9.

deny the petition for review by Power, Inc.[11]

*It is so ordered.*

KAREN LeCRAFT HENDERSON, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority opinion except Parts II(B) and II(D). I agree with the majority's ultimate conclusion in Part II(D) that the NLRB's issuance of a remedial bargaining order should be upheld but, given that "petitioner here does not dispute" the NLRB's *Gissel* I classification, Majority Opinion at 421–23, I find unwarranted the discussion of *Gissel* II and non-Gissel cases, *see id.* at 423–24, and therefore decline to join it. In addition, I disagree with the majority's disposition in Part II(B) upholding the NLRB finding that Power's decision not to rehire Robert Dillen violated section 8(a)(3) of the NLRA. "[D]etermining whether the employer's actions were motivated by anti-union animus is necessarily the crucial first step in a § 8(a)(3) case." *Goldtex, Inc. v. NLRB*, 14 F.3d 1008, 1011 (4th Cir.1994). Thus, "[u]nwise and even unfair decisions" will not be deemed unfair labor practices in violation of section 8(a)(3) "unless they are carried out with the intent of discouraging participation in union activities." *Id.* The record here lacks substantial evidence of such intent in the Dillen rehiring decision. It is uncontroverted that Dillen made the short list for the two advertised mechanic positions and was in fact interviewed for them. By Dillen's own testimony, the two interviewers, Andrews and Minor, seemed eager to hire him, without regard to his past union activity, and even to arrange for additional training if necessary. JA 1826–27, 1845–46. Further, undisputed testimony by Andrews reveals that Dillen was his and Minor's third choice for the two openings and would have been offered employment had either of the first two declined it. *Id.* at 2020. Finally, I do not see how the reasons

proffered for passing over Dillen in favor of the other two can possibly be termed "patently pretextual," as the ALJ did. *See* ALJ Decision at 26. Those reasons reflect the business judgment of the two men charged with filling the openings, *see* JA 2011–12, and as such "must be respected by the Board," *Goldtex*, 14 F.3d at 1012. In any event, the question of pretext "does not even enter the picture until some evidence of a discriminatory discharge has been brought forward." *Id.* In the absence of such evidence here I dissent from the majority decision regarding Dillen.

---

11. We also deny petitioner's motion to strike respondent's brief, which petitioner alleges includes material not part of the record on appeal. We have not relied upon any of the challenged material except to take judicial notice of the fact that after thirteen disputed ballots were counted as ordered by the Board, the union won the election and was certified. This fact is "not subject to reasonable dispute" and "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," and therefore appropriate for judicial notice. *See* FED.R.EVID. 201.